(Reap. Dec. 10130)

ALBERT F. MAURER CO. *v.* UNITED STATES

Entry No. 13418.

(Decided December 19, 1961)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*William H. Orrick, Jr.*, Assistant Attorney General (*Murray Sklaroff* and *Samuel D. Spector*, trial attorneys), for the defendant.
*Lamb & Lerch* (*David A. Golden* of counsel) as *amicus curiae*.

DONLON, Judge: Men's overshoes, or low cut rubbers made of natural rubber, product of Brazil and imported at Philadelphia, were appraised on the basis of American selling price, pursuant to a Presidential proclamation promulgated February 1, 1933 (T.D. 46158), under authority of the so-called "flexible" provision, section 336, of the Tariff Act of 1930 (19 U.S.C. § 1336).

Plaintiff challenges the appraisement on two principal grounds: First, that the Presidential proclamation (T.D. 46158) is unconstitutional in its application to rubber footwear, manufactured in Brazil, because the investigation of the Tariff Commission basic to the Presidential proclamation was limited to footwear, manufactured in Czechoslovakia; and, second, that the domestic article which was used by the appraiser in determining American selling price for purposes of appraisement is not, in fact, similar to the imported merchandise.

As to the American selling price, plaintiff introduced no evidence that shows any price other than that which was found by the appraiser. It appears to be plaintiff's argument that, if the court should overrule plaintiff's contention that the Presidential proclamation is unconstitutional, then the Presidential proclamation is not applicable

to this merchandise, because there is no domestic American article which is similar, in the tariff sense, to the imported article.

The parties have stipulated that, if the court should hold that American selling price is not the proper basis for appraisement of this merchandise, conditions subsist which are appropriate to a finding that there is an export value in Brazil for such merchandise, that such export value is $1.25 per pair, net, packed, and that foreign value is not higher. It appears that this merchandise is an article enumerated in the final list promulgated under the provisions of the Customs Simplification Act of 1956 (T.D. 54521), and, inasmuch as importation here was subsequent to February 27, 1958, appraisement (if not at American selling price) is to be at the higher of foreign or export values.

In reaching its decision, the court has considered an extensive record and the briefs of the parties, as well as a brief that was filed by *amicus curiae*.

Plaintiff's argument on the issue of constitutionality may be summed up as follows: These rubbers are the product of Brazil. The Presidential proclamation was based on findings made after investigation of rubbers the product of Czechoslovakia. (The Presidential proclamation had to do also with certain types of rubber footwear, manufactured in Czechoslovakia and in Japan; but, as to rubber footwear of the kind here involved, the proclamation was stated to be predicated on conditions found to exist in Czechoslovakia.) Rubbers from Brazil are not, so plaintiff argues, included among articles that are to be valued at American selling price under the terms of the Presidential proclamation, because only rubbers from Czechoslovakia are included. But if Brazilian rubbers are included under the proclamation, then such inclusion is unconstitutional, for the reason that Congress did not delegate to the President authority to prescribe, on the basis of conditions found to exist in one country, namely, Czechoslovakia, that articles imported from another country, namely, Brazil, as to which no such conditions were found to exist, should be valued at American selling price.

The first part of this argument requires a decision as to whether rubbers from Brazil are included under the Presidential proclamation. The second part is whether, if so included, such inclusion is constitutional.

None of the briefs cites any case in which the first part of plaintiff's argument has been litigated in nearly 40 years since the "Flexible Tariff Law" was enacted. Independent research discloses no decision that is on all fours with that issue, as here litigated. To be sure, the merchandise in *Jno. G. McGiffin* v. *United States*, 38 Cust. Ct. 609, Reap. Dec. 8767, was knee-length rubber boots from Germany, as-

sessed at American selling price under the identical Presidential proclamation here in issue. The only reference to applicability of the proclamation to rubber boots, the product of Germany, is found in the following language from Judge Lawrence's opinion:

It is not disputed that the imported boots are proper subjects of appraisement on the basis of section 402(g), as amended, pursuant to the Presidential proclamation. . . . [P. 610.]

Clearly, the issue here presented was not argued in the *McGiffin* case. Plaintiff there accepted American selling price as the basis of appraisement, but contended that the appraiser had based value on the American selling price of a domestic article which was not similar to the imported German boots. The *McGiffin* case will be discussed later, in considering the issue of similarity. It did not decide whether the Presidential proclamation of February 1, 1933, validly applied to rubber boots of German origin, for that issue was not presented, as Judge Lawrence pointed out.

In *Japan Import Co.* v. *United States*, 24 C.C.P.A. (Customs) 167, our appeals court (affirming this court) held that the authority which is granted by Congress to the President, under section 336(b) of the Tariff Act of 1930, is not an unlawful delegation of the taxing power committed to the Congress under the Constitution; namely, the authority, after finding that an equalization in differences in cost of production cannot be accomplished by additional tariff rates beyond those provided by statute, to equalize such differences by directing that the ad valorem rates of duty may be based on the American selling price of the domestic article, as defined in section 402a(g), as amended.

But even the *Japan Import* case does not quite meet the issue which plaintiff raises here as to scope of the Presidential proclamation. For, in that case, the merchandise was canvas-topped shoes, product of Japan; and Japan was a country as to which the Presidential findings had been made, basic to the proclamation authorizing American selling price as the basis of appraisement of canvas-topped shoes. Clearly, no finding was made by the President as to rubber footwear, product of Brazil; and Brazil is the country of origin of the merchandise here in controversy. The *Japan Import* case is precedent for holding that rubber footwear from Czechoslovakia is subject to appraisement on the basis of American selling price. That is not the issue here. It is not a precedent for holding that rubber footwear from Brazil is subject to appraisement on American selling price, based on the Czechoslovakia proclamation.

What did Congress intend when the "Flexible Tariff Act" was enacted? While it is subdivision (b), of section 336, Tariff Act of 1930, with which this litigation is concerned, it may be helpful to

set forth the provisions both of subdivision (a) and subdivision (b) of that section because, in some part, at least, the interpretation of the latter is related to the former.

§ 336. Equalization of costs of production.

(a) Change of classification or duties.

In order to put into force and effect the policy of Congress by this chapter intended, the commission (1) upon request of the President, or (2) upon resolution of either or both Houses of Congress, or (3) upon its own motion, or (4) when in the judgment of the commission there is good and sufficient reason therefor, upon application of any interested party, shall investigate the differences in the costs of production of any domestic article and of any like or similar foreign article. In the course of the investigation the commission shall hold hearings and give reasonable public notice thereof, and shall afford reasonable opportunity for parties interested to be present, to produce evidence, and to be heard at such hearings. The commission shall report to the President the results of the investigation and its findings with respect to such differences in costs of production. If the commission finds it shown by the investigation that the duties expressly fixed by statute do not equalize the differences in the costs of production of the domestic article and the like or similar foreign article when produced in the principal competing country, the commission shall specify in its report such increases or decreases in rates of duty expressly fixed by statute (including any necessary change in classification) as it finds shown by the investigation to be necessary to equalize such differences. In no case shall the total increase or decrease of such rates of duty exceed 50 per centum of the rates expressly fixed by statute.

(b) Change to American selling price.

If the commission finds upon any such investigation that such differences cannot be equalized by proceeding as hereinbefore provided, it shall so state in its report to the President and shall specify therein such ad valorem rates of duty based upon the American selling price of the domestic article, as it finds shown by the investigation to be necessary to equalize such differences. In no case shall the total decrease of such rates of duty exceed 50 per centum of the rates expressly fixed by statute, and no such rate shall be increased. [19 U.S.C. § 1336.]

Section 402a (g), Tariff Act of 1930, as amended, is as follows:

(g) American selling price.

The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale for domestic consumption to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article. [19 U.S.C. § 1402(g).]

As the statutory language indicates, the flexible tariff provision was intended to protect domestic articles from unfair competition, in

the domestic market, with low cost foreign articles. First enacted in 1922, this provision sought, as the name "flexible tariff" connotes, first, equalization in competition through adjustment of duty rates; and, second, where such rate adjustment did not adequately equalize cost differences, then by adjustment in the basis of valuation, for computation of ad valorem duties, to American selling price, as defined in the statute.

Section 315 of the Tariff Act of 1922 (predecessor of present section 336) was different from section 336 in at least two respects relevant to this litigation. First, the investigation antecedent to a Presidential proclamation was, under the 1922 act, to be an investigation of "differences in costs of production of articles wholly or in part the growth or product of the United States and of like or similar articles wholly or in part the growth or product of *competing foreign countries* . . . ." [Emphasis supplied.] Second, both the increased duty rates that could be applied without invoking American selling price as the basis of appraisement (subdivision (a) of section 315), and the ad valorem duty rates that could be applied on valuation at American selling price (subdivision (b) of section 315), were to be levied, collected, and paid on articles when imported from any foreign country.

What did Congress intend when it substituted for the flexible tariff provisions of the Tariff Act of 1922, the provisions cited, *supra*, that are found in the Tariff Act of 1930?

If the language used by Congress is not clear, it is the duty of the court to interpret what the Congress intended. A statute is to be construed so as to effect its general purpose. As Mr. Justice Frankfurter stated, in the principal opinion in *United States* v. *Shirey*, 359 U.S. 255:

Statutes, including penal enactments, are not inert exercises in literary composition. They are instruments of government, and in construing them "the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down." *United States* v. *Whitridge*, 197 U.S. 135, 143. This is so because the purpose of an enactment is embedded in its words even though it is not always pedantically expressed in words. See *United States* v. *Wurzbach*, 280 U.S. 396, 399. Statutory meaning, it is to be remembered, is more to be felt than demonstrated, see *United States* v. *Johnson*, 221 U.S. 488, 496, or, as Judge Learned Hand has put it, the art of interpretation is "the art of proliferating a purpose." *Brooklyn Nat. Corp.* v. *Comm'r*, 157 F. 2d 450, 451. In ascertaining this purpose it is important to remember that no matter how elastic is the use to which the term scientific may be put, it cannot be used to describe the legislative process. That is a crude but practical process of the adaptation by the ordinary citizen of means to an end, except when it concerns technical problems beyond the ken of the average man.

Applying these generalities to the immediate occasion, it is clear that the terms, the history, and the manifest purpose of 18 U.S.C. § 214 coalesce in a construction

of that statute which validates the information against Shirey. The evil which Congress sought to check and the mischief wrought by what it proscribed are the same when the transaction is triangular as when only two parties are involved. [Pp. 260–262.]

It is legislative history that the Tariff Act of 1930 was enacted only after protracted hearings, amendments in the committee bill by the House itself, by the Senate committee, and on the Senate floor. The two bills went to conference. The flexible tariff provisions were not free of controversy and contention.

Briefly summed up, section 336, in the form in which it was enacted into law, appeared for the first time in the conference report (H. Rept. No. 1893, 72 Congressional Record 10737, at p. 10741). There were substantial changes from both the House and Senate bills in section 336 as the conferees recommended that section to their respective Houses.

The report of the conference managers for the House quite fully states what the conferees intended. Under the amended section, so the report states, the new investigation procedure (fully outlined) would culminate in a report of the Tariff Commission to the President; and then the report proceeds as follows:

The President shall by proclamation approve the rates of duty and the changes in classification or in basis of value specified in the report of the commission, if in his judgment such rates and changes are shown by the investigation of the commission to be necessary to equalize the differences in cost of production. The President may not modify a rate, classification, or basis of value so specified by the commission. If the President adjudges that such specified rates or charges are not so shown to be necessary to equalize such differences, he is not required to act upon the commission's report, and the specified rates or changes do not take effect. On the other hand, if the President makes a proclamation approving the rates or changes specified by the commission, *they will take effect* commencing 30 days after the date of such proclamation and will supersede the rates, classifications, or bases of value then fixed by law *with respect to the articles covered by the proclamation when imported from any foreign country* into the United States or into any of its possessions except the Philippine Islands, the Virgin Islands, American Samoa, and the island of Guam. [72 Congressional Record, at p. 10745.] [Emphasis added.]

Both the House and Senate accepted the conference report in respect of section 336, voted the proposed section without further amendment, and it became law by the President's signature.

From the foregoing, and from other proceedings of the Congress and committees in connection with section 336, it is clear that the unwieldy and delaying provision of the Tariff Act of 1922, requiring investigation as to articles produced in the *competing countries*, without limitation, was simplified in the Tariff Act of 1930 so as to require investigation only as to conditions in the *principal competing country*; but that, once rate changes or change in basis of valuation had been

proclaimed by the President, such changes were to be applicable across the board, that is, for the articles whatever the country of export might be. That this was the intention is further fortified by the broad language of section 1, which provides:

Except as otherwise specially provided for in this chapter, there shall be levied, collected, and paid upon all *articles when imported from any foreign country* . . . [19 U.S.C. § 1001]. [Emphasis added.]

The court is cited to no language providing "otherwise" in respect of the flexible tariff authority, save only section 336 itself. (Section 350(a), later discussed, is not relevant to this issue.) Certainly section 336 contains no limiting language such as that for which plaintiff argues; and the conference report makes it clear that adjustments in rates, and in the basis on which rates were to be computed, when proclaimed by the President, were not limited to the products of any single country or of specified countries.

To hold as plaintiff asks the court to hold, would be to interpret that the intention of Congress, in enacting section 336 of the Tariff Act of 1930, was to require that there be a multiplicity of investigations, separately for every country for which flexible tariff adjustment was proclaimed. *That* was not the congressional intention. To the contrary, Congress intended, and said that it intended, to provide that only one investigation would be necessary, namely, in the principal competing country, and that this single investigation was to be the basis for findings on which adjustments, when proclaimed by the President, would be applicable to all imported articles, whatever their country of export.

In the language of Mr. Justice Frankfurter, in the *Shirey* case, *supra*, it seems clear that the terms, the history, and the manifest purpose of the flexible tariff enactment coalesce in a construction of the statute which supports the interpretation urged by defendant. The court finds that rubber footwear from Brazil is included under the Presidential proclamation, T.D. 46158, and that Congress intended such inclusion.

The next consideration is whether this statute, interpreted as the court finds Congress intended, is an unconstitutional delegation of legislative power by Congress to the Executive. Plaintiff argues that such delegation is unconstitutional.

The only case cited by plaintiff in support of this argument is *Hampton, Jr., & Co.* v. *United States*, 14 Ct. Cust. Appls. 350, T.D. 42030, affirmed 276 U.S. 394. Plaintiff's brief excerpts from the opinion in that case certain negative language, and cites it as authority, minus the negative. It is necessary to recall what the court there actually said. This is the sentence *in toto*:

We are, therefore, of the opinion that section 315 is not so uncertain of administration as to amount to a delegation of legislative power to the Chief Executive, but is, in that respect, a valid exercise of the constitutional power of the Congress. [14 Ct. Cust. Appls. 350, at p. 367.]

Section 315, thus broadly construed, was a section in the Tariff Act of 1922, and it contained, as mentioned, *supra*, a provision in precise language making a Presidential proclamation, issued pursuant to section 315, applicable to "such articles when imported *from any foreign country.* . . ." [Emphasis added.]

The *Hampton* case, far from being authority in support of the unconstitutionality of a delegation by Congress to the Executive of authority such as was here exercised, to adjust tariff rates and the basis on which duties are computed, holds instead that such delegation is constitutional. No arguments are presented that suggest that our appeals court and the United States Supreme Court were in error in so holding. We know of no reason for a decision other than that Congress constitutionally delegated to the Executive, in section 336, flexible authority to modify tariff rates applicable to an article, imported from any country, on the basis of findings made after investigation of conditions in the principal country competing (as to that article) with like or similar articles produced in the United States.

As pointed out earlier, the decision in *Japan Import Co.* v. *United States*, 24 C.C.P.A. (Customs) 167, also sustained the constitutionality of section 336.

In issuing his proclamation (T.D. 46158), the President exercised a legislative function which we have found Congress had constitutionally delegated to him. It is a transparent contradiction in terms to suggest that the President acted unconstitutionally. Plaintiff cites no authority in support of this argument, and we know of none. The exercise by the Executive of legislative power duly delegated by Congress, is not an unconstitutional Executive act.

There remains for consideration plaintiff's contention that the appraiser did not value these Brazilian rubbers on the basis of an American article which is similar to the imported merchandise and, moreover, that there is no domestic article which is like or similar to the imported article.

This is an issue that has been litigated, with respect both to rubber shoes and to other kinds of merchandise. If there is no like or similar American article, then appraisement is not to be made at American selling price; for the American selling price, under such circumstances, would be the price of an article that is neither like nor similar to the imported article. The flexible tariff provision has to do with competitively like or similar articles. *Japan Import Co.* v. *United States, supra.*

In order to rule out American selling price for valuation of imported merchandise, as to which the President has proclaimed that American selling price shall be the basis for appraisement, plaintiff has the twofold burden of proving, first, that the domestic article which the appraiser used in appraisement is not like, or similar to, the imported article; and, second, that there is no American article which is like or similar to the imported article.

The cases have laid down standards for determining similarity, for purposes of American selling price valuation. Subsequently decided cases frequently cite *Japan Import Co.* v. *United States, supra,* as a precedent. Such cases include *United States* v. *Japan Import Co., Inc.,* 2 Cust. Ct. 926, Reap. Dec. 4568; *Mutual Supply Co.* v. *United States,* 5 Cust. Ct. 614, Reap. Dec. 5062; *Hoyt, Shepston & Sciaroni* v. *United States,* 38 Cust. Ct. 741, A.R.D. 74; and *Geo. S. Bush & Co., Inc.* v. *United States,* 43 Cust. Ct. 577, Reap. Dec. 9563, affirmed on review, *Id.* v. *Id.,* 46 Cust Ct. 754, A.R.D. 126.

In the earlier of the two *Japan Import* cases, in which final decision was by our appeals court, the imported merchandise was canvas-topped shoes, rubber-soled, which were imported from Japan. They were valued by the appraiser at the American selling price of a domestic canvas-topped shoe, rubber-soled, of the type commonly known as "sneakers." The imported shoes sold in the United States at wholesale for 35 cents to 50 cents a pair; the domestic shoes at 69 cents a pair. The shoes were similar in appearance, and in weight and style. However, there was testimony that the domestic shoe was of a better quality, in several respects, than the imported shoe. For instance, the domestic shoe had a ventilating feature, the insoles fit more closely than did the insole of the Japanese shoe, the cross-corrugations on the soles of the American shoe were better, and the soles were more flexible in the American shoe than in the Japanese shoe. Both shoes were sold in the same kinds of stores, and to the same class of customers. Both were adapted to the same uses and purposes. Our appeals court sustained this court, which held that the domestic shoe and the Japanese shoe were similar, for purposes of appraisement of the imported article at the American selling price of the domestic article.

In the *Bush* case, *supra,* the second division of this court, sitting in appellate term, quoted with approval the opinion of the trial judge on the problem of proof, as follows:

All that is required for a valid appraisement of imported merchandise on the basis of American selling price is that the domestic article or articles upon which appraisement is predicated be "like or similar" to the goods imported. If the merchandise used by the appraiser for valuation purposes meets that test, then, the appraiser's action must be upheld. Whether or not one domestic article is "more" similar to an imported article than another domestic article used as the

basis of appraisement must, of course, be determined by the record in each particular case. Of course, if there is such a disparity between the domestic article used as the basis of appraisement and the imported goods so as to render the designation "similar" inapplicable to the domestic article, then, the appraiser's action in using such domestic article for valuation purposes on the basis of American selling price is improper. * * *

In the second *Japan Import Co.* case, *supra*, in which the imported merchandise consisted of rubber-soled footwear with paper uppers that were cotton lined, the second division of this court, sitting in appellate term, defined the conditions for determining whether an imported article is like or similar to a particular domestic article, as follows:

It is evident from a study of the authorities that the factors to be considered in determining the question of whether an imported article is like or similar to a domestic article which may be taken as the basis of appraisement under said section 336 are (1) similarity of material; (2) commercial interchangeability; (3) adaptability to the same use; and (4) competitive character. [P. 933.]

Applying these standards to the imported and domestic overshoe rubbers of this litigation, it is noted that they have similarity of material, namely, india rubber, and that they are adapted to the same use, namely, as "rubbers" or overshoes. In those two respects, the test of similarity is met.

Whether there is or is not commercial interchangeability of the two articles, and whether they are competitive in character, are standards as to which the facts have not been so conclusively developed.

The imported article (exhibit 2) was manufactured in Brazil by Galocha Moderna, Inc. The domestic article (exhibit 3) was manufactured in Rahway, N.J., by Tingley Rubber Co. The Philadelphia appraiser, Frank E. Randa, testified that the Tingley rubber was the article he used for purposes of appraisement of the Brazil rubber.

Plaintiff's case appears to rely in considerable part on differences in construction of the two articles. That there are such differences is established by the proofs, and visual examination of the exhibits confirms those differences.

The imported rubber is so constructed as to permit air to circulate while walking. This is said to prevent foot perspiration. The domestic rubber hugs the shoe, so that air does not circulate freely.

The imported rubber has a design which features angles and flat surfaces. The domestic rubber is of different style. It has a curved surface.

The imported rubber has a lip opening that is smaller than the lip opening of the domestic article. The lip permits the rubber to slip over the shoe. The smaller opening places pressure on the sole of the foot, rather than on the body of the foot; and it holds the rubber on

the shoes, so that the rubber does not slip off easily in mud or snow. The domestic rubber has a larger lip opening. It clings to, or hugs, the shoe, and is said to exert pressure on the entire foot. Less force is required to remove the domestic rubber from the shoe.

The imported rubber is more flexible. It can be folded so as to take up less space than the folded domestic rubber would take up. While the domestic rubber is also flexible, it is said not to be as flexible as the imported rubber is.

The imported rubber weighs less and has greater skid resistance than the domestic article.

The gum composition of the rubber used in the manufacture of the imported article imparts greater hardness to the rubber, than does the rubber used in the domestic article. The greater hardness contributes to the firm positive contact in the holding area, around the top of the rubber, and in part is responsible for the appearance of the rubber.

These are substantially the differences in construction of the two articles as described in the record.

In the first *Japan Import* case, *supra*, the decision was that shoes with canvas tops and rubber soles, imported from Japan, were similar (for purposes of appraisement at American selling price) to American shoes with canvas tops and rubber soles, notwithstanding the superiority of the American shoe in appearance, workmanship, construction, cost of production, and selling price.

In the second *Japan Import* case, *supra*, the decision was that Japanese shoes with *paper* uppers, cotton-lined, and rubber soles, were not similar to American shoes with canvas tops, cotton-lined, and rubber soles. No paper was used in the construction of the American article. Paper was used in construction of the Japanese article.

In *Mutual Supply Co.* v. *United States*, *supra*, rubber-soled shoes, with cotton uppers, were imported from Japan. Testimony of merchants, dealers, and salesmen handling that shoe was that the domestic shoe (used by the appraiser as a "similar" article) was worn by Japanese farmers in California, and was more flexible and better adapted to the uses of farm workers than was the imported shoe. None of the witnesses had seen the imported shoe used by Japanese farmers. The Japanese and American shoes were not sold in the same stores. The imported shoe, when examined in cross-section, showed that it was made of soft, light rubber and was fastened with poor, loose rubber cement which was easily detached. The rubber edge of the sole was also easily detached, being attached with adhesive reinforced by stitching, and this attachment was done in an unworkmanlike manner. The rubber edge of the domestic shoe was heavier and had no stitching; the rubber in it was more resilient; above the heel, there was a rubber guard,

and this the imported shoe lacked. The sole of the domestic shoe had five layers of rubber; the imported shoe only four layers, including the inner sole. The domestic shoe was reinforced by a metal strip in front of the heel; the imported shoe contained no metal. The quality of material used in the inner soles, uppers, and tongue of the domestic shoe was superior to that of the imported shoe. On that record, the trial judge found, and held, that the domestic shoe and imported shoe were not similar.

In *Geo. S. Bush & Co., Inc.* v. *United States, supra,* the imported merchandise was also Japanese rubber-soled shoes, with canvas uppers. Plaintiff there conceded that appraisement should be based on the American selling price of a domestic article, but claimed that the article the appraiser had used was not a similar article. Comparison of the domestic shoe used as the basis of appraisement and of the imported shoe showed that the domestic shoe had a heavier sole than did the imported shoe; that the wrapping around the outer sole of the two shoes looked much the same, but that the design was slightly different; that the canvas of the domestic shoe was heavier than was the canvas used in the imported shoe; that stitching was similar, and that both shoes had the same number of eyelets; that the insole of the domestic shoe was made of hard black rubber; that it did not have a cushioned insole, which the imported shoe had. These were the differences described. However, there also were similar differences between the domestic shoe used by the appraiser and the domestic shoe which plaintiff claimed as a similar article. On these facts, the trial judge found, and held, that there were not such differences between the domestic shoe which the appraiser had used and the imported shoe, as to negative their similarity. On review, the second division, appellate term, of this court held that plaintiff had failed to establish an American selling price for its claimed domestic shoe and, therefore, it had not overcome the presumption of correctness of the appraiser's action. Hence, the appellate term found it unnecessary to consider the issue of similarity. The *Bush* case is not, in its entirety, authority either one way or another as to what are, or are not, standards of similarity in rubber shoes.

In *Jno. G. McGiffin* v. *United States, supra,* it was held that plaintiff had not borne the burden of proof as to components of an American selling price of an article different from the article used for the appraiser's valuation. Hence, the court found it unnecessary to decide whether differences "in appearance, material, design, construction, and serviceability" of two American articles, made one of them the more similar to the imported article.

In contrast to the cases cited, *supra,* in which the domestic article was generally of superior construction to the imported article, it is noted that, in this litigation, the imported rubber is claimed to be

better constructed and a superior article. This, alone, does not establish that the two articles may not be competitive or commercially interchangeable, as defendant claims they are.

Plaintiff's witnesses expressed their opinion that the differences in construction of the two articles made them noncompetitive. There are, of course, articles which, being differently constructed, are commercially noncompetitive. This may be so in the case of shoes made for a luxury trade and those made for a low price trade. Such are not competitive, because the expensive shoe is made for sale to a different trade than is the less expensive shoe. They are not commercially interchangeable in the sense that one would be an acceptable replacement for the other, in the market place, at comparative prices.

The record here is silent as to the range in style and price of men's low cut rubber overshoes. The appraiser is presumed to have found that the Galocha rubber is commercially interchangeable and competitive with the Tingley rubber. There are no *facts* in this record that rebut the presumption that this finding is correct. Plaintiff's witnesses stated conclusory opinions. Whether the two articles are or are not commercially interchangeable and competitive is for the court to find from the proofs of record. There are here no evidentiary facts as to commercial interchangeability and competition of the two articles. Mere opinion evidence of an ultimate reasoned conclusion to be reached by the court, is not enough. *Kobe Import Co.* v. *United States,* 42 C.C.P.A. (Customs) 194, C.A.D. 593.

In *United States* v. *Mutual Supply Co.,* 20 Cust. Ct. 418, Reap. Dec. 7578, affirmed, *Mutual Supply Co.* v. *United States,* 38 C.C.P.A. (Customs) 44, C.A.D. 437, the merchandise was hokkigai clams, from Japan. They were appraised on the basis of the American selling price of domestic whole butter clams, packed on the Pacific coast. The physical appearance of the two clams was similar, except that the foot of the Spisula (hokkigai) clam was pink in color, and the foot of the Saxidomous (butter) clam was cream or grey in color. The two clams differed in taste and odor. They were sold in different stores, catering to different trades. The trial judge held the two clams were dissimilar, on the ground that "in comparing two foodstuffs, partcularly those which may be classed as delicacies, peculiarities of taste, odor, and appearance are extremely important and have a vital bearing on the value of each of the items in question." (18 Cust. Ct., at p. 343.) On review, the second division, appellate term, of this court, reversed the trial judge and held that the clams are similar, stating:

In the case of *United States* v. *Wecker,* 16 Ct. Cust. Appls. 220, our appellate court laid down what appears to us to be a practicable and workable test or rule for use in cases involving the question of similarity, such as the present case, as follows:

\* \* \* The question of similarity is, in each case, to be measured by much the same homely rule that applies to the prospective customer who enters a store seeking some utilitarian article of a certain specified name and style; he finds the article requested is not in stock but that another article, of approximately the same price and which will perform the same functions, is capable of the same use and may be substituted therefor, is available. Such an article is a similar article, notwithstanding the price, the methods of construction, and the component materials may be somewhat different; but, for all utilitarian purposes, one is a substitute for the other. It is in this sense, we believe, that the word similar was used in said section 402 (b).

We perceive of no reason why a different construction should be given to or placed upon the word "similar" as used in section 336 of the Tariff Act of 1930 than was given to the same term as used in section 402(b) by our appellate court in the *Wecker* case, *supra*. [20 Cust. Ct., at p. 420.]

\* \* \* \* \* \* \*

In reaching our conclusion in this case, we have not overlooked or failed to give consideration and weight to much testimony in the record tending to show that the hokkigai clam and the whole butter clam are not like or similar; that the whole butter clam was never sold in Japanese stores; and that the Japanese people ate only the Japanese clam, whether it be the hokkigai clam or some other species. Under the facts and circumstances of this case, we do not consider too seriously the two latter factors.

Upon a full consideration of the entire record, we are satisfied that, notwithstanding the fact that the price, the methods of construction, and the component materials in the hokkigai clam may be somewhat different from those same elements appearing in the whole butter clam, for all utilitarian purposes one is a substitute for the other; the two will perform the same functions, are capable of the same use, and may be substituted, one for the other. [20 Cust. Ct., at p. 422.]

On appeal, our appeals court sustained the appellate term and quoted with approval the language above cited.

The facts here of record bring the Galocha rubber and the Tingley rubber within the "homely rule" of *United States* v. *Wecker & Co.*, *supra*. Notwithstanding admitted differences in construction, the Galocha rubber has not been shown to be so dissimilar "for all utilitarian purposes" to the Tingley rubber, as not to be a commercially acceptable substitute for it. Plaintiff has failed to overcome the presumption that the appraiser correctly found these two rubbers to be similar, within the intent of Congress, under section 336 of the Tariff Act of 1930.

Plaintiff, having failed to establish that the Tingley rubber is not a similar article, in the statutory sense, has *a fortiori* failed to show there is *no* American rubber which is similar to the imported rubber.

While this finding makes unnecessary our evaluation of certain testimony, it is well to refer to the proof which plaintiff adduced on this issue. Mr. Josetti, who said he has been employed in the Brazilian consulate at Philadelphia since 1928, testified, in plaintiff's

behalf, that it was his personal opinion "dealing with these overshoes for all this time" that there is no American rubber that competes with the Galocha rubber. No great weight can be accorded to this testimony. Mr. Josetti said that he never had manufactured, nor had he ever sold rubber overshoes. He did not clearly say how he had dealt with "these overshoes"; but if it was other than as a consular agent, helping to develop his country's business in and around Philadelphia, there is nothing to show it. His competence to give such a broad opinion, embracing all American rubber overshoes manufactured everywhere in the United States, was not established.

Section 350(a) of the Tariff Act of 1930, as amended (19 U.S.C. § 1352), provides, in part, as follows:

(a) The provisions of section 1336 of this title shall not apply to any article with respect to the importation of which into the United States a foreign-trade agreement has been concluded pursuant to this part, or to any provision of any such agreement. * * *

Rubber overshoes are included in such foreign trade agreements. Counsel raise no issue as to the above provision, either in their statements to the court or in their briefs. This is doubtless because the authority to conclude foreign trade agreements is prospective in its impact on section 336. The Presidential proclamation, under which these rubbers were appraised, antedates the enactment of section 350(a).

This has resulted in the continuing valuation of imported merchandise, notwithstanding trade agreements, on the basis of competitive conditions that were found to exist over three decades ago. Whether Czechoslovakia is any longer the "principal competing country" producing rubber overshoes, it is not our province to consider. One consequence of what may be an inequity, due to elapse of a considerable period of time and change in competitive conditions, has been the substantial increase in litigation before this court, challenging appraisements that are being made on the basis of American selling price pursuant to long ago Presidential proclamations. Whether or not there is such inequity, is a political issue that only Congress can decide. It is not an issue appropriate for court decision.

On this record, I find as facts:

1. That, on February 1, 1933, following a report of the Tariff Commission to the President, on an investigation of footwear, composed wholly or in chief value of india rubber, produced in Czechoslovakia, the President, pursuant to section 336 of the Tariff Act of 1930, proclaimed a change in valuation, based on the American selling price of footwear, composed wholly or in chief value of india rubber, manufactured or produced in the United States (T.D. 46158), for imported footwear like or similar to said footwear manufactured or produced in the United States.

2. That the imported merchandise consists of men's low cut rubber overshoes of india rubber, manufactured in Brazil by Galocha Moderna, Inc., and imported into the United States in 1958.

3. That the imported merchandise was appraised on the basis of American selling price, as provided in section 402a(g) of the Tariff Act of 1930, as amended, pursuant to the Presidential proclamation recited in finding No. 1, *supra*.

4. That the domestic article selected by the appraiser as the basis for appraisement of the imported article at American selling price was a low cut rubber overshoe of india rubber, manufactured by Tingley Rubber Co., Rahway, N.J.

5. That the low cut rubber overshoe manufactured by Galocha Moderna, Inc., is similar to the low cut rubber overshoe manufactured by Tingley Rubber Co., within the intent of Congress under section 336 of the Tariff Act of 1930.

I conclude as a matter of law:

1. That the Presidential proclamation of a change in valuation based on the American selling price of footwear, composed wholly or in chief value of india rubber, manufactured or produced in the United States, under authority of section 336 of the Tariff Act of 1930, is applicable to like or similar footwear imported from any foreign country, including Brazil.

2. That the power delegated to the President, in section 336 of the Tariff Act of 1930, is a valid exercise of the constitutional power of Congress, and was constitutionally exercised by the President.

3. That the proper basis of appraisement of the imported merchandise is American selling price, as such value is defined in section 402a(g) of the Tariff Act of 1930, as amended.

4. That such value is the appraised value.

Judgment will enter accordingly.