**E. DILLINGHAM, INC., Plaintiff,**

**v.**

**UNITED STATES, Defendant.**

**R.D. 11747; Reappraisement No.**
**R66/16072 and 4 others.**

United States Customs Court.

July 30, 1971.

Allerton deC. Tompkins, New York City, for plaintiff.

L. Patrick Gray, III, Asst. Atty. Gen., Peter Jay Baskin, New York City, trial atty., for defendant.

Lamb & Lerch, New York City (David A. Golden, New York City, of counsel), amici curiae.

RAO, Chief Judge:

The merchandise involved in this case consists of children's and misses' rubber boots imported at Alexandria Bay, New York from the Bata Shoe Company of Canada, Ltd., from March through May 1963. It was appraised on the basis of American selling price, as defined by section 402a(g) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, under the authority of a Presidential Proclamation issued February 1, 1933, as a result of an investigation under the flexible tariff provision, section 336 of the Tariff Act of 1930. 63 Treas.Dec. 232, T.D. 46158.

Plaintiff claims that the merchandise should have been appraised on the basis of export value. The parties have agreed that in the event the court holds the merchandise should not be valued on the basis of American selling price, export value, as defined in section 402a(d) of said Tariff Act, as amended, is the proper basis for appraisement and that such export values are as follows:

| ITEM | | APPRAISED PER PAIR * | EXPORT VALUE PER PAIR |
|---|---|---|---|
| Misses White | — #3–156 | $3.15 | $2.14 |
| Misses Brown | — #3–456 | 3.00 | 2.01 |
| Misses Red | — #3–556 | 3.00 | 2.14 |
| Child's White | — #2–156 | 3.05 | 2.01 |
| Child's Brown | — #2–456 | 2.90 | 1.89 |
| Child's Red | — #2–556 | 2.90 | 2.01 |

* less 13%, less 2%.

Plaintiff claims that American selling price was not the proper basis of valuation on the ground that no "like or similar" boots were produced in the United States during the period of importation (March through May 1963); that the appraisements were arbitrary and illegal on the ground that the Government refused to produce or identify the domestically produced boot that was used for appraisement purposes; and that the appraisements were unconstitutional on the ground that: (a) Congress has gone beyond its constitutional power; (b) the President has usurped a legislative function; (c) the description of the product covered by the proclamation is too broad.

The pertinent provisions of the Tariff Act of 1930 and the Presidential Proclamation T.D. 46158, are as follows:

## SEC. 336. EQUALIZATION OF COSTS OF PRODUCTION.

(a) *Change of Classification or Duties.*—In order to put into force and effect the policy of Congress by this Act intended, the commission (1) upon request of the President, or (2) upon resolution of either or both Houses of Congress, or (3) upon its own motion, or (4) when in the judgment of the commission there is good and sufficient reason therefor, upon application of any interested party, shall investigate the differences in the costs of production of any domestic article and of any like or similar foreign article. In the course of the investigation the commission shall hold hearings and give reasonable public notice thereof, and shall afford rea-

sonable opportunity for parties interested to be present, to produce evidence, and to be heard at such hearings. The commission is authorized to adopt such reasonable procedure and rules and regulations as it deems necessary to execute its functions under this section. The commission shall report to the President the results of the investigation and its findings with respect to such differences in costs of production. If the commission finds it shown by the investigation that the duties expressly fixed by statute do not equalize the differences in the costs of production of the domestic article and the like or similar foreign article when produced in the principal competing country, the commission shall specify in its report such increases or decreases in rates of duty expressly fixed by statute (including any necessary change in classification) as it finds shown by the investigation to be necessary to equalize such differences. In no case shall the total increase or decrease of such rates of duty exceed 50 per centum of the rates expressly fixed by statute. [This section does not apply to any article provided for in a trade agreement entered into under section 350 of this Act. See section 2(a) of the Act of June 12, 1934, as set forth in the note appended to section 350.]

(b) *Change to American Selling Price.*—If the commission finds upon any such investigation that such differences can not be equalized by proceeding as hereinbefore provided, it shall so state in its report to the President and shall specify therein such ad valorem rates of duty based upon the American selling price (as defined in section 402(g) of the domestic article, as it finds shown by the investigation to be necessary to equalize such differences. In no case shall the total decrease of such rates of duty exceed 50 per centum of the rates expressly fixed by statute, and no such rate shall be increased.

Section 402a(g) of the Tariff Act of 1930:

SEC. 402a. * * *

* * * * * *

(g) *American Selling Price.*—The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale for domestic consumption to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article.

The pertinent provisions of the President's Proclamation, T.D. 46158, are as follows:

Whereas under and by virtue of section 336 of Title III, Part II, of the act of Congress approved June 17, 1930 (46 Stat. 590, 701), entitled 'An Act to provide revenue, to regulate commerce with foreign countries, to encourage the industries of the United States, to protect American labor, and for other purposes,' the United States Tariff Commission has investigated the differences in costs of production of, and other facts and conditions enumerated in said section with respect to, * * * boots and shoes or other footwear, wholly or in chief value of india rubber, not specially provided for, being wholly or in part the growth or product of the United States, and of and with respect to like or similar articles wholly or in part

the growth or product of the principal competing countries;

Whereas in the course of said investigation a hearing was held, of which reasonable public notice was given and at which parties interested were given reasonable opportunity to be present, to produce evidence, and to be heard;

Whereas the commission has reported to the President the results of said investigation and its findings with respect to such differences in costs of production;

Whereas the commission has found it shown by said investigation * * * that the principal competing country for boots, shoes, or other footwear, wholly or in chief value of india rubber, provided for in paragraph 1537(b) of Title I of said act, is Czechoslovakia, and that the duties expressly fixed by statute do not equalize the differences in the costs of production of the domestic articles and the like or similar foreign articles when produced in said principal competing countries; and that said differences can not be equalized by proceeding under the provisions of subdivision (a) of said section and act;

Whereas the commission has specified in its report the ad valorem rates of duty based upon the American selling price, as defined in section 402(g) of said act, of the domestic articles found by the commission to be shown by said investigation to be necessary to equalize such differences; and

Whereas in the judgment of the President such ad valorem rates of duty based upon said American selling price are shown by such investigation of the Tariff Commission to be necessary to equalize such differences in costs of production:

Now, therefore, I Herbert Hoover, President of the United States of America, do hereby approve said report and proclaim * * * that the rate of duty shown by said investigation to be necessary to equalize such differences, within the limit provided in said section 336, on boots, shoes, or other footwear, wholly or in chief value of india rubber, not specially provided for, is 25 per centum ad valorem based upon the American selling price of boots, shoes, or other footwear, wholly or in chief value of india rubber, not specially provided for, manufactured or produced in the United States.

■ The aforesaid proclamation indicates that an investigation was made as to the differences in costs of production of boots, shoes and other footwear, wholly or in chief value of india rubber, the product of the United States, and like or similar articles the product of principal competing countries; that the Tariff Commission found the principal competing country to be Czechoslovakia and that in order to equalize costs ad valorem duties should be imposed on the basis of the American selling price of the domestic articles. Plaintiff claims that since no reference was made by the Tariff Commission and no investigation was shown to have been conducted on cost factors relating to Canadian rubber footwear nor the peculiar type of cold weather boot produced there, it was illegal to appraise the imported merchandise on the basis of American selling price.

These arguments have been before the courts on previous occasions and have been rejected. H. H. MacDonaugh & Co., The Mutual Supply Co. v. United States, 38 CCPA 36, C.A.D. 436 (1950); Albert F. Maurer Co. v. United States, 51 CCPA 114, C.A.D. 845 (1964).

In the *MacDonaugh* case the domestic shoes used for appraisement purposes were not in existence at the time the Tariff Commission made its investigation. It was held that whether or not a particular brand or style of shoe was then in existence was immaterial as long as the shoe came within the class or kind covered by the investigation and fell within the description given in the proclamation. It was pointed out that otherwise the power would be placed in

the hands of exporters to render ineffective the American selling price provision "by the simple expedient of creating new trade or brand names, numbers, or designations for application to articles differing slightly in shape, but not different in any essential substance or form from articles which were in existence at the time of the investigation by the Tariff Commission and the issuance of the President's proclamation."

■ In Albert F. Maurer Co. v. United States, *supra,* the court held that the constitutionality of section 336 had been settled by Hampton, Jr., & Co. v. United States, 14 Ct.Cust.Appls. 350, T.D. 42030 (1927), affirmed 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928), and Japan Import Co. v. United States, 86 F.2d 124, 24 CCPA 167, T.D. 48642 (1936), and that an investigation of " 'this unique overshoe,' the Galocha Moderna" was unnecessary since the proclamation under section 336 relates to future imports not known at the time of the proclamation. It stated (p. 121):

> The contention that the language of the Presidential Proclamation which names the goods is too broad is nothing more than a contention. No authority is cited. We see no reason why the broad language used was not within the power delegated to the President. The specific language of the proclamation complained of is:
>
>> boots, shoes, or other footwear, wholly or in chief value of india rubber, provided for in paragraph 1537(b) * * *.
>
> Appellant's complaint is:
>
>> The language of his [the President's] proclamation covers every conceivable type of india rubber footwear known to man; it covers everything, *but everything.* [Italics quoted.]
>
> Actually it covers only imported articles of india rubber footwear which sufficiently resemble articles of American manufacture to compete with them. If the Tariff Commission investigation showed that the india rubber footwear industry was being injured by competition from imports, we see no reason for restricting the proclamation to specific articles and appellant has shown us none. Moreover, the proclamation itself shows on its face that the Tariff Commission "has investigated the differences in costs of production of, and all other facts and conditions enumerated in said section [336] with respect to" the precise field covered by the proclamation. See H. H. MacDonaugh & Co. v. United States, *supra.* Appellant seems to assume that the investigation made and the field affected were not commensurate but has not shown this to be so.

An adherence to plaintiff's views would require the Tariff Commission to investigate separately the cost of production of rubber boots manufactured in each exporting country and compare them with the cost of producing like or similar domestic boots. As stated in the brief of *amici curiae:*

> * * * It would be a relatively simple matter for foreign exporters to shift their manufacturing operation to a country with even lower costs of production than the one determined by the Tariff Commission to be the principal competing one and thereby have full access to our markets without the payment of increased duties or American selling price basis of appraisement as proclaimed, on the grounds that the particular exporting country was not investigated. Nor does it seem logical that the Tariff Commission must investigate the cost of production in *every* competing country when the statute clearly states it shall investigate "the like or similar article when produced in the principal competing country". Obviously, once it has been established that the rate of duty or the basis of appraisement should be changed as the result of an investigation by the Tariff Commission of this "principal competing country" then *all* exporting countries of the same com-

modity must receive the same treatment.

See also the extensive discussion on this point in the opinion of the trial judge in the *Maurer* case. Albert F. Maurer Co. v. United States, 47 Cust.Ct. 560, Reap.Dec. 10130 (1961).

By the protocol of the terms of accession by Japan to the General Agreement on Tariffs and Trade, 90 Treas.Dec. 234, T.D. 53865 (1955), the rate of duty on boots, shoes or other footwear, wholly or in chief value of india rubber, under paragraph 1537(b), Tariff Act of 1930, was reduced. A special notation in the following language was added:

> NOTE: The duty on the foregoing articles is to be calculated on the basis specified in T.D. 46158.

The negotiators of the trade agreement evidently considered that the President's proclamation was not limited to boots, shoes, and footwear from Czechoslovakia but covered those from all countries.

See also headnote 3(b), part 1A, schedule 7 of the Tariff Schedules of the United States, indicating a continuing policy of appraising rubber footwear on the basis of the American selling price.

We conclude that the appraisement of the within merchandise on the basis of American selling price under authority of the aforesaid Presidential Proclamation was not unconstitutional.

■■ Plaintiff claims, however, that appraisement on the basis of American selling price was erroneous on the ground that at the time of importation there was no like or similar boot produced in the United States. Obviously, if there be no like or similar article, appraisement may not properly be made on the basis of American selling price. Albert F. Maurer Co. v. United States, 47 Cust.Ct. 560, 568, Reap.Dec. 10130 (1961), affirmed 50 Cust.Ct. 539, A.R.D. 153 (1963), affirmed 51 CCPA 114, C. A.D. 845 (1964). Where an appraise-

ment has been made on that basis, it is presumptively correct, and the burden rests on plaintiff to establish that at or about the date of exportation no like or similar domestic article existed, or, if any existed, that there was a legal or factual reason why the elements of the American selling price basis of valuation were not met by the condition under which it was offered for sale. A. Zerkowitz & Co., Inc. v. United States, 48 Cust.Ct. 559, Reap.Dec. 10175 (1962).[1] It is not incumbent upon the Government to prove that the appraised value is proper until and unless the importer shows *prima facie* that the appraisement is erroneous and establishes a different value in place thereof. Kobe Import Co. v. United States, 42 CCPA 194, C.A.D. 593 (1955); Arditi v. United States, 50 CCPA 49, C.A.D. 818 (1963). The presumption attaches not only to the determination of the specific subsidiary fact actually found, but also to the appraiser's valuation, and the party contesting the appraisement must offer evidence making out at least a *prima facie* case establishing the nonexistence of all other possible subsidiary facts the existence of which would support the appraiser's determination. Hudson Shipping Co., Inc. v. United States, 43 CCPA 19, C.A.D. 604 (1955); A. Zerkowitz & Co., Inc. v. United States, 58 CCPA ——, 435 F.2d 576, C.A.D. 1005 (1970). Here, the appraisement was presumably made on the basis of the American selling price of a like or similar domestic boot. To rebut that presumption plaintiff must establish that no like or similar American boot existed or was being sold at the time of importation here.

To meet its burden, plaintiff presented the testimony of three witnesses and four exhibits. Defendant countered with the testimony of three other witnesses and four exhibits.

■ It is plaintiff's contention that the imported boots were designed especially

1. Memorandum to accompany order setting aside submission and restoring case to calendar. This case eventuated in the de-cision in A. Zerkowitz & Co., Inc. v. United States, 435 F.2d 576, 58 CCPA ——, C.A.D. 1005 (1970).

as over-the-shoe, waterproof, heavy-duty, non-skid boots, in which trousers or snowsuits can be tucked, to keep the feet warm and dry in very cold climates and to keep out snow and slush; that the combination of all the various features made these boots particularly useful for these purposes, and that no domestic boot had all of these features.

Representative samples of the imported merchandise were received in evidence as exhibits 2 and 3. Each is a rubber over-the-shoe, waterproof boot having a front gusset, a buckle and strap fastening arrangement, an inside shearling cuff, fleece lining, heavy outer sole, heavy treading, and foxing all around the boot.

To show the absence of a similar American boot, plaintiff introduced in evidence a letter dated December 19, 1962 from the Bureau of Customs to Mr. N. W. Boyd at the Canadian Embassy in Washington. (Exhibit 4.) This refers to a sample of an overshoe manufactured by the Bata Shoe Company of Canada, Ltd., designated as article number 3–486, described as a misses' fold and buckle compounded rubber overshoe, fleece lined, and with a shearling cuff on the inside. The letter states in part:

> The Bureau at the present time has no knowledge of like or similar footwear being produced and freely offered in the United States.

Whether or not the article designated as number 3–486 was similar to the boots involved herein, the letter does not establish that similar domestic boots were not produced and sold in March through May of 1963. It indicates only that the Bureau did not know of any in December of 1962.

At the trial, Anthony Tony Daicar, General Sales Manager of the Canadian manufacturer, testified that boots of the kind involved herein were designed for Canadian winters and that prior to the exportation of such merchandise to the United States in 1963, he had visited several towns in the area of the United States adjoining the St. Lawrence River, where the winters are severe, to find out whether there would be a market there for this type of footwear and if a similar American boot was then being sold. He did not find anything which was suitable or was the same as the Canadian boot and did not know of any produced in 1963 that was adapted to the same uses, performed the same functions, was commercially interchangeable, could be substituted for it, or was similar in appearance, durability, quality, construction, workmanship or finish.

Mr. Russell H. Hurd, President of the Hurd Shoe Company, a wholesale distributor of footwear in the Northeastern United States, testified that he had first heard about the Canadian boot from his salesman who wanted a similar item and that he had visited major shoe shows and made an investigation of the market but was unable to find a domestic boot which had all the same features as the Canadian one.

Mr. Sheldon Frank, President of Henry Frank Leather Company, a wholesale supplier of footwear in the central New York area, testified that he had combed the domestic market for a boot such as the imported one but that nothing was available in 1962 and 1963.

According to these witnesses the combination of the following features in the imported boot makes it unique and especially adapted for use where the weather is extremely cold and there is a good deal of snow and slush: The gusset made of a folding piece on the front of a boot makes it easier to get the boot on and off; it forms a complete seal to keep snow and slush out and the heat of the foot in; it will not collect snow or refuse. The heavy outsoles are extremely warm over the feet and the longitudinal cleats give better traction. The foxing goes around the entire shoe and acts as a buffer, providing a sturdy waterproof seal at points of greatest wear. The foxing is elevated on the back for easy kick-off purposes. The shearling leather cuff keeps ice and slush from going down and heat from going out. The felt inner sole serves as insulation

to prevent cold from coming up through the sole. The strap and buckle fastener can be easily handled and adjusted to the right size by a child; it also has a place on the back where the owner's name can be written. The fleece lining keeps the foot warm, adds stiffening and has a nap making it easier to slide the shoe on and off.

Defendant's witnesses, John C. Mac-Kennon, Assistant to the President of B. F. Goodrich Company; Morris Zeligman, a salesman who was employed by LaCrosse Rubber Mills in 1962 and 1963; and Herschel O'Connell, who is in charge of distribution in the Rochester, New York area of the products of Uniroyal, Inc. (formerly United States Rubber Company) produced samples of boots which their respective companies were manufacturing and selling in 1962 and 1963, and which they considered similar to the Canadian boot. (Exhibits A, B, C and D.) These witnesses testified:

Exhibit A is constructed of rubber and has a cuff designed to keep out the snow and prevent irritation and chafing in back of the leg. It has a buckle fastening to close the top of the boot around a child's leg or snowsuit. It is different from the fastening of exhibits 2 and 3 but serves the same function. The boot has a gusset of a different construction from that of the imported boot. Its purpose is the same—to provide an opening so that the child can get his foot in. The boot has a thick sole with a tread to prevent the child from slipping. It has a lining to provide warmth and prevent snagging. It has foxing from shank to shank, that is, around the critical areas where the child is apt to hit the shoe against an object. It has a felt inner sole to provide insulation for warmth. It is designed not only for use in cold and snow but for use in the rain.

Exhibit B is also of rubber and has a shearling cuff, a fleece lining, a fiber inner sole, a gusset, an adjustable strap fastener, a treaded sole and foxing around the front where the stress is.

Exhibit D is a rubber boot with a nylon cuff, nylon fleece lining, an inner sole, a gusset for getting the boot on and off, an adjustable strap and buckle fastener, a non-skid sole, and foxing from shank to shank.

Exhibit C is a plastic boot. Since defendant has conceded that "if this Court finds that Exhibits A, B, or D are not 'similar', it is unlikely that Exhibit C will be found to be 'similar' ", this exhibit will not be considered further.

The samples and the testimony demonstrate that the imported boots and exhibits A, B, and D all have the same principal features: They are made of rubber and have a gusset for ease in putting the boot on and off, a strap and buckle fastening arrangement, a cuff in the interior of the opening, a lining, an insole, foxing, and treads on the outer sole. The most striking difference apparent to visual examination is that the imported boots have gussets in front, opening out so that they fold over on the outside, whereas exhibits A, B, and D have side gussets which are inset and fold on the inside. Exhibits 2 and 3 have heavier soles than the domestic boots and have foxing all around and a tread which consists of lugs or ribs. None of defendant's exhibits has foxing all around nor is the tread as heavy. Exhibits 2 and 3 have a buckle and pin type of fastening, whereas the others have a sliding buckle for adjustment.

Mr. Hurd testified in rebuttal that the fastening of exhibit A is a lightweight sliding arrangement difficult for a child to adjust and that the strap will fall off. He said that the gusset has no lining and has a tendency to collect refuse, snow and slush in the opening. The cuff is made of dynelon or nylon which is not as good as shearling in keeping the heat in and the slush and snow out. It is not as warm, will not spring back into shape when compressed, and tends to get soaking wet faster.

As to exhibit B, Mr. Hurd stated that it has a knurled sole with no cleats which does not furnish as much traction

as exhibits 2 and 3. It has a rag insole which does not furnish as much insulation as felt. There is no way to keep the buckle from sliding off the strap. The gusset hangs apart and does not serve as a barrier against snow or slush.

According to Mr. Hurd, the structure of exhibit D is of lighter weight; the outsole is thin; the cuff is nylon, not shearling; it has a rag insole; the boot does not open as wide as exhibits 2 and 3; the slide arrangement on the strap is difficult for a child to operate.

The witnesses expressed different opinions as to the similarity of the imported boots and exhibits A, B, and D, their commercial interchangeability, functional suitability for use in cold, snowy weather, and competitiveness. Mr. Hurd stated that when mothers come into a store and see exhibits D and 2 side by side, they will pick up exhibit 2. In his opinion exhibits 2 and 3 are far superior in overall construction for the performance of the function they were designed for: to keep a child's foot warm and dry in severe winter weather; to be easily put on and taken off and adjusted by the child himself. Mr. O'Connell testified that the same retail sellers were purchasing exhibit D and exhibits 2 and 3 and were selling them in the same areas of stores and that no distinction was made between the sale of one or the other. According to Mr. Hurd, the price was quite similar.

For the purpose of determining similarity or dissimilarity in American selling price cases, the courts have formulated four tests as guidelines: (1) similarity of material, (2) commercial interchangeability, (3) adaptability to the same use, and (4) competitive character. Japan Import Co. v. United States, 2 Cust.Ct. 926, Reap.Dec. 4568 (1939); A. Zerkowitz & Co., Inc. v. United States, *supra.*

In applying these guidelines, it was held in the *Japan Import* case that the imported shoes were not similar because the uppers of the imported shoe were made of paper whereas those in the do-

mestic shoe were canvas; the imported merchandise was sold at a much lower price; and it appeared that most imported shoes were immediately returned by the American customers because the paper uppers when wet became separated from the sole thereby destroying the shoe and demonstrating that it was not capable of the same use as the domestic shoe and was not in fact competitive.

In Japan Import Co. v. United States, 86 F.2d 124, 24 CCPA 167, T.D. 48642 (1936), it was pointed out that if goods are commercially interchangeable and adaptable to substantially the same uses and are so used, they are similar, and that a few changes in structure will not make them dissimilar. In that case the imported merchandise consisted of canvas topped shoes of the "lace-to-toe" type with rubber soles, reinforcement of various portions of the toe and canvas tops with rubber pieces. On the basis of the samples and the record, the trial court and appellate term found they were similar to domestic articles and the Court of Customs and Patent Appeals affirmed, pointing out (page 130, 24 CCPA pages 174–175):

* * * The testimony shows that the imported shoes sold variously from 35 cents to 50 cents a pair at wholesale. The usual price for the domestic shoes, at the time of importation, was approximately 69 cents a pair wholesale. Some testimony was offered to the effect that the domestic product in some cases was of a better quality than the imported shoes; for instance, some of these domestic articles were said to have a cloth upper which permitted the passage of air, thus ventilating the shoe. The insoles were said to be closer fitting and the cross corrugations on the soles of better quality. It was also claimed that the soles of some of the domestic shoes were more flexible. The evidence, however, did show that the imported shoes and the domestic shoes were sold in the same establishments, to the same class of customers, and were adapted for the same uses and

purposes. The witnesses differed to some degree as to whether they considered the imported and domestic shoes to be similar, some expressing the opinion definitely that they were similar for selling purposes, while others had the contrary opinion.

In Albert F. Maurer Co. v. United States, *supra,* the question was whether the imported Galocha Moderna rubbers were like or similar to the domestic Tingley rubbers. Both were molded gum rubber men's rubbers, full size, unlined, unreinforced, and without tabs at the front of the top or "lip" opening. They were translucent and were provided on their tread surface with nonskid patterns. They differed in numerous mechanical and functional details. The Galocha Moderna was a little lighter and its rubber a little harder; its bottom pattern gave it better anti-skid properties; it took more force to pull it off the shoe; its top opening was smaller; it was of oversized dimensions to provide air space between the shoe and the rubber and had a smaller opening in order to retain it on the shoe. It was of a modern design as compared with the Tingley rubber. In spite of the dissimilarities the court held them similar, stating (page 120):

> \* \* \* We do so because they are both men's molded gum-rubber overshoes, adapted to the same uses, sold to the same purchasers through the same channels of trade, and because the imported rubbers are certainly competitive with the domestic product. The fact that the modern appearance and possible advantages of the imported rubbers may make them *better* in the eyes of and preferred by some customers only serves to make them *more* competitive and is but added reason to preserve the economic protection contemplated by Congress in enacting section 336. [Italics quoted.]

In A. Zerkowitz & Co., Inc. v. United States, 435 F.2d 576, C.A.D. 1005 *supra,* it appeared that some of the domestic tennis shoes used as the basis of appraisement of the American selling price contained cushioned insoles and shock absorbing arch cushions which the imported shoes did not. In holding that the domestic shoes were dissimilar the court said:

> While we agree with the majority below that the *Maurer* case found that goods may be "similar" within the meaning of 19 USC 1336 although they are dissimilar in many details, we agree with the dissenting judge that the "policy considerations" which compel a finding of legal similarity between competing goods dissimilar in structural detail do not "require a finding of similarity within the meaning of the statute merely because the foreign and domestic items fall within the same broad use classification." In this case the imported and domestic footwear may look alike, as the trial judge wrote, but even the cursory examination to which consumers might be expected to subject them, let alone the expert, technical examinations evidence of which was introduced in this case, reveals that at least some of the imported shoes are markedly inferior in quality to the domestic shoes to which they were adjudged "similar" in that they lack cushioned insoles and arch supports. We cannot agree with the trial judge, whose reasoning on this point was adopted by the Appellate Term, that the imported tennis shoe is "competitive" with the domestic shoe, and therefore "similar" to it, because it is, percentage wise, even cheaper than it is inferior. \* \* \*

> As we wrote in *Maurer,* the "flexible tariff" mechanism seems to have been designed to protect articles of domestic manufacture "where imports are sufficiently similar to American goods *to compete directly* with them", id. at 119 (emphasis supplied); it seems highly unlikely that it was intended to protect manufacturers of domestic goods as dissimilar to the imported goods as are the United States Rubber Company's post-1959 U. S. Keds "Rover" tennis shoes. So construed, similarity under 19 USC 1336

is, as our predecessor court wrote in United States v. Wecker & Co., 16 Ct. Cust.Appls. 220, 225, T.D. 42837 (1928),

> * * * to be measured by much the same homely rule that applies to the prospective customer who enters a store seeking some utilitarian article of a certain specified name and style; he finds the article requested is not in stock but that another article, of approximately the same price and which will perform the same functions, is capable of the same use and may be substituted therefor, is available. Such an article is a similar article, notwithstanding the price, the methods of construction, and the component materials may be somewhat different; but, for all utilitarian purposes, one is a substitute for the other.

> And, we would now add, it is approximately what the customer wanted and acceptable to him as a substitute.

The court noted, however, that there was no dissimilarity between the imported tennis shoes and the domestic ones because the imported shoes had a patented sole which rendered them more skid-resistant than the domestic shoes and the sole and the canvas in the uppers of the imported shoe were lighter and less durable. (Footnote 7.)

In the instant case it appears that both the imported and the domestic articles are waterproof, rubber, over-the-shoe boots, having all the same features, though differing somewhat in construction and secondary material, sold to the same purchasers through the same channels of trade for about the same price and for the same purposes—protection against cold, snow, and slush. The fact that the construction and material of some of the features of the imported boots may make them of a better quality or a little more suitable for use in extremely cold, snowy weather makes them more competitive rather than uncompeti-

tive. In this case, contrary to the *Zerkowitz* case, the domestic boots do not lack any of the features of the foreign boots. The differences are only in degree and are not sufficient to make them dissimilar within the meaning of the American selling price formula. For all utilitarian purposes, one is a substitute for the other.

We conclude that plaintiff has failed to establish that appraisement of the imported boots on the basis of the American selling price and the authority of the Presidential Proclamation was erroneous, illegal or unconstitutional.

On the record presented, I find as facts:

1. That the merchandise involved herein consists of waterproof over-the-shoe boots imported at Alexandria Bay, N. Y. from Canada, during the period from March through May 1963.

2. That said merchandise appears on the Final List promulgated by the Secretary of the Treasury, 93 Treas.Dec. 14, T.D. 54521.

3. That said rubber boots were appraised on the basis of American selling price, as defined in section 402a(g) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, pursuant to the authority of a Presidential Proclamation issued February 1, 1933 (63 Treas.Dec. 232, T.D. 46158) at the prices indicated below:

| Item | Appraised Value * Per Pair (U. S. $) |
|---|---|
| Misses White | $3.15 |
| Misses Brown | 3.00 |
| Misses Red | 3.00 |
| Child's White | 3.05 |
| Child's Brown | 2.90 |
| Child's Red | 2.90 |

* less 13%, less 2%, packed.

4. That there were several American produced rubber boots sold in 1963, which were physically similar to the imported boots. That the imported boots and the domestic boots have the same features, though differing somewhat in construction and secondary material. They are sold to the same purchasers

through the same channels of trade for about the same price and for the same purposes—protection against cold, snow, and slush.

5. That there were several American boots in 1963, which served the same function as the imported boots.

6. That the imported boots were competitive with several American boots in 1963.

7. That the plaintiff has failed to establish that there were no rubber boots produced or manufactured in the United States in 1963, which were similar to the imported rubber boots.

8. That the plaintiff has failed to establish that there were no domestic rubber boots which could have been used, in 1963, as the basis for the American selling prices applied to the imported boots.

I conclude as matters of law:

1. That the aforesaid Presidential Proclamation of a change in the basis of valuation to that of the American selling price of footwear, composed wholly or in chief value of india rubber, manufactured or produced in the United States, under authority of section 336 of the Tariff Act of 1930, is applicable to like or similar footwear imported from any foreign country, including Canada.

2. That the power delegated to the President, in section 336 of the Tariff Act of 1930, is a valid exercise of the constitutional power of Congress, and was constitutionally exercised by the President.

3. That the plaintiff has failed to rebut the presumption of correctness attaching to the appraised values herein.

4. That American selling price, as defined in section 402a(g) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the values of the merchandise involved herein.

5. That such values are represented by the appraised values.

Judgment will be entered accordingly.