**A. ZERKOWITZ & CO., Inc., Appellant,**

**v.**

**The UNITED STATES, Appellee.**

**Customs Appeal No. 5348.**

United States Court of Customs
and Patent Appeals.

Dec. 30, 1970.

Sharretts, Paley, Carter & Blauvelt, New York City, attorneys of record, for appellant. Eugene F. Blauvelt, Gail T. Cumins, New York City, of counsel.

William D. Ruckelshaus, Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Frederick L. Ikenson, New York City, for the United States.

Lamb & Lerch, New York City, amici curiae; David A. Golden, New York City, of counsel.

Before RICH, ALMOND, BALDWIN, and LANE, Judges, and McMANUS,

Judge, Northern District of Iowa, sitting by designation.

RICH, Judge.

This appeal is from the judgment of the United States Customs Court, Second Division, Appellate Term (one judge dissenting in part), 62 Cust.Ct. 986 and 297 F.Supp. 350 (A.R.D. 250), affirming the judgment of a single judge sitting in reappraisement, 55 Cust.Ct. 643 (R.D. 11095). The imported goods are tennis shoes imported from Japan during the years 1958, 1959, and 1960. Both at trial and on appeal they were held properly appraised on the basis of the American selling price, as defined in 19 U.S. C. § 1402(g), of tennis shoes manufactured by the United States Rubber Company and sold as the U. S. Keds "Rover". We remand.

There are three issues. The first is whether inclusion of the imported merchandise in concessions to the Japanese in our 1955 trade agreement with Japan made improper its appraisement on the basis of the American selling price of like or similar domestic articles. The second issue, which we reach because we agree with the conclusion below on the first issue, is whether the use of the U. S. Keds "Rover" tennis shoes as the basis for the American selling price appraisement made below was proper. The third issue, which we reach because we find that not all the domestic tennis shoes used as the basis for the appraisement below were legally "similar" to the imported tennis shoes, is whether any other domestic tennis shoes could have been used as the basis for an American selling price appraisement.

I. *Propriety of the Basis of Appraisement*

■ The imported footwear is admittedly classifiable under paragraph 1530(e) of the Tariff Act of 1930, as amended, at a rate of 20% ad valorem. The question is valuation. Zerkowitz concedes that prior to the effective date of the 1955 trade agreement with Japan

these goods were properly appraised on the basis of the American selling price of like or similar domestic articles by virtue of Presidential Proclamation No. 2027 (T.D. 46158; 63 Treas.Dec. 232), duly promulgated under the provisions of 19 U.S.C. § 1336. Subsection (a) of section 1336, headed *"Equalization of Costs of Production—Change of Classification or Duties,"* authorized the Tariff Commission to "investigate the differences in the costs of production of any domestic article and of any like or similar foreign article," and if it found "that the duties expressly fixed by statute * * * [did] not equalize the differences in the costs of production of the domestic article and the like or similar foreign article when produced in the principal competing country", the commission was to report to the President "such increases or decreases in rates of duty expressly fixed by statute * * * as it * * * [found] * * * to be necessary to equalize such differences," with the added constraint that in no case should the total increase or decrease of such rates of duty exceed 50 per centum of the rates expressly fixed by statute. However, if it found that the differences in the foreign and domestic costs of production could not be equalized by the mechanism provided in subsection (a), subsection (b) authorized the commission to so state in its report to the President and to "specify therein such ad valorem rates of duty based upon the American selling price of the domestic article, as it * * * [found] * * * to be necessary to equalize such differences," with the added constraints, first, that in no case should the total decrease of rates of duty exceed 50 per centum of the rates fixed by statute, and, second, that no such rate should be increased. The President was then authorized by subsection (c) to "approve" the rates of duty and changes in the basis of value specified by the commission "if in his judgment such rates of duty and changes are shown by such investigation of the commission to be necessary to

equalize such differences in costs of production." Proclamation No. 2027, supra, was so made.

However, Zerkowitz contends that subsection 1352(a) of 19 U.S.C. removed the disputed goods from the purview of section 1336 and that section 1402(a) of 19 U.S.C., which sets forth the five possible bases upon which the imported tennis shoes might have been appraised, only authorized appraisement on the basis of the American selling price of a like or similar domestic article when the rate of duty applied to the imported goods was one in effect as the result of a section 1336 proceeding.

The portion of 19 U.S.C. § 1352(a) on which Zerkowitz relies reads:

> The provisions of section 1336 of this title shall not apply to any article with respect to the importation of which into the United States a foreign-trade agreement has been concluded pursuant to this part * * *.

A foreign-trade agreement with respect to the importation into the United States of the merchandise in suit had been concluded. Therefore, Zerkowitz contends, section 1336 was not applicable to the merchandise in suit, and, since 19 U.S.C. § 1402(a), read in conjunction with 19 U.S.C. § 1402(g), only authorized appraisement on the basis of American selling price "In the case of an article with respect to which there is in effect *under section 336* [19 U.S.C. § 1336] a rate of duty based upon the American selling price of a domestic article * * *" (emphasis ours), the appraisement of the merchandise in suit on an American selling price basis was not authorized.

The Appellate Term of the Customs Court held that the above-quoted portion of 19 U.S.C. § 1352(a)

> addresses itself solely to the use of section 1336 as a *procedural device*, and that what is intended by the language above noted is the barring of

the use of that statutory procedure in derogation of the operation of a trade agreement concluded pursuant to section 1351. To admit of the broad construction of section 1352 for which appellant contends would, in our view, require the addition of language to that above noted so as to make the statute applicable not only to the provisions of section 1336 of this title, but to make it also applicable to the customs treatment of articles pursuant thereto. [Emphasis in the original.]

With that conclusion we agree. The controverted portion of 19 U.S.C. § 1352(a) is prospective, barring use of the section 1336 procedures to undo what has been done by a foreign-trade agreement; it does not, in itself, nullify changes in rates of duty, classification, or bases of appraisement brought about by previous use of the section 1336 procedures.

However, this conclusion does not settle the issue. Section 1402 only authorized appraisement on the basis of American selling price "In the case of an article with respect to which there is *in effect* under section 336 [19 U.S.C. § 1336] a rate of duty based upon the American selling price of a domestic article" (emphasis ours), and, since in this case the rate of duty originally set by a section 1336 proceeding was no longer being collected, having been superceded by a rate of duty set by the foreign-trade agreement with Japan, Zerkowitz contends that there was no rate of duty based upon the American selling price of a domestic article "in effect under section 336" when the goods here in issue were imported.

The Appellate Term relied on reasoning similar to that which we employed in Barclay & Co. v. United States, 47 CCPA 133, C.A.D. 745 (1960), to meet this argument, holding that

> * * * section 1336 was at best only suspended,[1] and this, *pro tanto* to

---

1. What the lower court meant by "section 1336 was * * * suspended" was, of

course, that the tariff consequences of the proceeding undertaken pursuant to

the extent of the duty rate, leaving intact the basis of valuation of the merchandise affected by section 1336.

 Again, we agree with the conclusion reached below. In *Barclay* the rate of duty levied on certain imported goods had been set, successively, by the Tariff Act of 1930 simpliciter (30%), by a proclamation issued under authority of 19 U.S.C. § 1336(a) (45%), and by a proclamation implementing a foreign-trade agreement issued under authority of 19 U.S.C. § 1351 (22½%). When the second proclamation was terminated by still a third proclamation, we ruled that the rate of duty reverted to that specified in the first proclamation (45%) rather than to that specified in the statute (30%), holding "that the second proclamation did not abrogate the first but merely suspended it, and that repeal of the second operated to restore the first." Id. at 135. The *Barclay* decision in turn relied on two earlier cases [2] holding that upon the recission of a second section 1351 proclamation which had superceded a previous section 1351 proclamation, the original section 1351 proclamation controlled tariff treatment of the subject merchandise. Although these cases are all distinguishable on the facts in that different sequences and combinations of section 1336 proclamations and section 1351 proclamations were involved, we think that a common legal principle runs through all of them. The promulgation of successive proclamations under sections 1336 and 1351 of 19 U.S.C. does not, in itself, abrogate previous proclamations, but merely suspends them. Accordingly, at the time the goods here in issue were imported there was "in effect under section 336 [19 U.S.C. § 1336] a rate of duty based upon the American selling price of a domestic article," and it was thus proper to appraise them under 19 U.S.C. § 1402(g) on the basis of the American selling price of a like or similar domestic article.

## II. Propriety of the Instant Appraisement

The imported footwear was appraised on the basis of the American selling price of the United States Rubber Company's U. S. Keds "Rover" tennis shoes pursuant to determination: (1) that the domestic shoes were "similar" [3] to the imported shoes within the meaning of that word in 19 U.S.C. § 1336 and (2) that the American selling price of the domestic shoes had been determined in the manner specified by 19 U.S.C. §1402(g). Holding that the lower court erred in giving too broad a scope to the word "similar," we remand for further determinations as to the first point ("A" infra), but we agree with the conclusion below as to the second point ("B" infra).

### A. Were the Domestic Shoes Similar?

In finding the requisite similarity between the imported and domestic footwear, the court below relied primarily on two cases, Japan Import Co. v. United States, 2 Cust.Ct. 926, R.D. 4568 (1939), and Albert F. Maurer Co. v. United States, 51 CCPA 114, C.A.D. 845 (1964). From the former case it adopted the following four subtests: (1) similarity of material, (2) commercial interchangeability, (3) adaptability to the same use, and (4) competitive character. From the latter case it seems to have concluded that of the four subtests, that of competitiveness is preeminent. Nevertheless, it made findings of fact on all four subtests, declaring that the foreign and domestic shoes "were made of similar material, were of similar con-

---

section 1336(b) (the change in the basis of valuation and the continuation of the pre-existing rate of duty) were suspended, not that section 1336 itself was suspended.

2. United States v. Metropolitan Petroleum Corp., 42 CCPA 38, C.A.D. 567 (1954),

and United States v. American Bitumuls & Asphalt Co., 246 F.2d 270, 44 CCPA 199, C.A.D. 661 (1957).

3. The Government does not contend that the domestic shoes are "like" the imported shoes.

struction, had subtantially the same uses and purposes,[4] and would compete for purchase by many of the same persons."

There can, of course, be no question that this court has jurisdiction to review the ultimate determination of "similarity" made by the court below, for as we previously expressly held in *Maurer*, supra (at p. 116), whether imported and domestic articles are "similar" within the meaning of 19 U.S.C. § 1336 is a question of law. However, the subtests upon which the lower court relied are more nearly questions of fact, and this court has long held that the findings of fact of an Appellate Term of the Customs Court in a reappraisement case will not be disturbed if there is "any substantial evidence"[5] in support of those findings. Japan Import Co. v. United States, 86 F.2d 124, 131, 24 CCPA 167, 175, T.D. 48642 (1936); A. N. Deringer, Inc. v. United States, 53 CCPA 135, 137, C.A.D. 890 (1966). This we take to mean that it has been the rule that such findings should not be disturbed even though they are "clearly contrary to the weight of the evidence." This rule has not been challenged here,[6] and we accordingly proceed on the assumption that the lower court's factual determinations supporting its legal conclusions of "similarity" may be disturbed only if unsupported by "any substantial evidence", or, of course, if predicated upon an incorrect intrepretation of law.

The chief point relied upon by Zerkowitz to establish legal dissimilarity between the imported tennis shoes and the domestic shoes used as the basis of the American selling price appraisal is a difference of material and construction. The U. S. Keds "Rover" tennis shoes sold from the year 1959 on contained cushioned insoles and shock-absorbing arch cushions which, Zerkowitz argues, made them so dissimilar in material and construction to the imported shoes that they were not "similar" thereto within the meaning of 19 U.S.C. § 1336.[7] Judge Richardson disagreed with his brethren on this point, among others, and we are persuaded that the majority did, in fact, apply the wrong legal standards in arriving at their determination of "similarity of material."

While we agree with the majority below that the *Maurer* case found that goods may be "similar" within the meaning of 19 U.S.C. § 1336 although they are dissimilar in many details, we agree with the dissenting judge that the "policy considerations" which compel a finding of legal similarity between competing goods dissimilar in structural detail do not "require a finding of similar-

---

4. The second and third subtests the lower court had considered together on the ground that "it is obvious that in an article such as this [,] commercial interchangeability would in fact be based upon use."

5. We have defined "substantial evidence" in this context as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." Brooks Paper Co. v. United States, 40 CCPA 38, 45, C.A.D. 495 (1952). The word "any," though constantly quoted as modifying the words "substantial evidence," does not seem to have affected the application of the rule in any way.

6. Indeed, appellant's brief contends only that the Appellate Term's findings of fact on this issue were "contrary to the preponderance of evidence." We regard this as an obvious slip of the pen, rather than as a tacit admission that the Appellate Term's findings did *not* constitute reversible error, because appellant urges the contrary.

7. Appellant also argues that the imported tennis shoes and the "Rover" tennis shoes were dissimilar at all times in that (1) the imported shoes have a patented sole which renders them more skid resistant than the domestic shoes and (2) the sole and the canvass in the uppers of the imported shoes are lighter and less durable than those in the domestic shoes. However, we agree with the lower court that these differences are immaterial. Cf. Albert F. Maurer Co. v. United States, cited supra and discussed infra.

ity within the meaning of the statute merely because the foreign and domestic items fall within the same broad use classification." In this case the imported and domestic footwear may look alike, as the trial judge wrote, but even the cursory examination to which consumers might be expected to subject them, let alone the expert, technical examinations evidence of which was introduced in this case, reveals that at least some of the imported shoes are markedly inferior in quality to the domestic shoes to which they were adjudged "similar" in that they lack cushioned insoles and arch supports. We cannot agree with the trial judge, whose reasoning on this point was adopted by the Appellate Term, that the imported tennis shoe is "competitive" with the domestic shoe, and therefore "similar" to it, because it is, percentage wise, even cheaper than it is inferior. There can be no doubt, to paraphrase Judge Richardson's dissent, that a relatively cheap Ford Falcon and a relatively expensive General Motors Corporation Cadillac are "competing" goods in the broad sense that both are used for private transportation and that in many cases the purchase of one for that purpose precludes the purchase of the other for the same purpose, but that is clearly not the kind of competition we were writing about in *Maurer*. Compare United States v. F. Victor & Achelis, 17 CCPA 412, 416, T.D. 43864 (1930).

As we wrote in Maurer, the "flexible tariff" mechanism seems to have been designed to protect articles of domestic manufacture "where imports are sufficiently similar to American goods *to compete directly* with them," id. at 119 (emphasis supplied); it seems highly unlikely that it was intended to protect manufacturers of domestic goods as dissimilar to the imported goods as are the United States Rubber Company's post-

1959 U. S. Keds "Rover" tennis shoes. So construed, similarity under 19 U.S.C. § 1336 is, as our predecessor court wrote in United States v. Wecker & Co., 16 Ct.Cust.Appls. 220, 225, T.D. 42837 (1928),

* * * to be measured by much the same homely rule that applies to the prospective customer who enters a store seeking some utilitarian article of a certain specified name and style; he finds the article requested is not in stock but that another article, of approximately the same price and which will perform the same functions, is capable of the same use and may be substituted therefor, is available. Such an article is a similar article, notwithstanding the price, the methods of construction, and the component materials may be somewhat different; but, for all utilitarian purposes, one is a substitute for the other.

And, we would now add, it is approximately what the customer wanted and acceptable to him as a substitute.

■ However, not all of the imported shoes lacked cushioned insoles and arch supports, and the U. S. Keds "Rover" also lacked cushioned insoles and arch supports before some date in the summer of 1959. As Judge Richardson's dissenting opinion amply demonstrates, the record on this point is confused, undoubtedly because neither the appraiser nor the trial judge thought this difference sufficiently significant to render the domestic and imported shoes legally "dissimilar." Accordingly, we remand for the purpose of permitting the lower court to determine which, if any, importations of the Japanese tennis shoes, *at the time of exportation of the imported articles* were "similar" to the domestically manufactured "Rover" being sold for domestic consumption and which were not.[8]

---

8. We note that Judge Richardson objected to the appraisement of certain importations of the Japanese tennis shoes on the basis of the American selling price of certain models of the "Rover" on the ground that other "Rover" shoes were more similar. The Customs Court has twice held that, if a "like" domestic article exists, its American selling price must be used in making these appraise-

**B.** *Was the American Selling Price of the Domestic Shoe Determined in the Manner Specified by 19 USC § 1402(g)?*

Even though there was the requisite legal "similarity" between at least some of the imported tennis shoes and the U. S. Keds "Rover" tennis shoes on the basis of whose American selling price they were appraised, the appraisement was still proper only if the American selling price of the "Rover" tennis shoes was determined in the manner specified by 19 U.S.C. § 1402(g). As the trial judge correctly pointed out, this subsection permits the determination of American selling price in three different ways:

1. By the price at which the domestic article is freely offered for sale for domestic consumption to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities, or

2. By the price that the manufacturer, producer, or owner would have received for such merchandise when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities, or

3. By the price that the manufacturer, producer, or owner was willing to receive for such merchandise when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities.

Both courts below found that the "Rover" tennis shoes satisfied all three criteria, and the Government has argued here, in effect, that their determinations as to the first criterion are supported by the evidence and that their determina-tions as to the other two criteria are supported by the presumption of administrative correctness. We cannot accept the latter premise. As we recently pointed out, where the appraiser may have arrived at his result on the basis of any one of a number of different subsidiary findings and there is no indication in the record which of the subsidiary findings he in fact made, there is no presumption that he made *all* of them. Mannesmann-Meer, Inc. v. United States, Cust. & Pat.App., 433 F.2d 829, decided October 29, 1970.

However, the presumption of correctness attaching to the appraiser's *result* is independent of the presumption of correctness attaching to the appraiser's subsidiary findings, and Zerkowitz therefore had the burden of proving that the American selling price of the "Rover" tennis shoes used as the basis for appraisement did not conform to any of the three criteria. As we have remarked, both courts below found that the "Rover" tennis shoes satisfied all three criteria, and we cannot upset their decision on this point if there was "any substantial evidence" that the selling price of the domestic shoes conformed to any one of the three criteria. When limited to such a narrow scope of review, "there is no occasion for a detailed review of all the evidence." United States v. Collin & Gissel, 123 F.2d 147, 148, 29 CCPA 96, 98, C.A.D. 176 (1941). Suffice it to say that, while we might find this a close case if the test were whether the determination was "clearly contrary to the weight of the evidence," we find that there was "substantial evidence" to support the finding below that the U. S. Keds "Rover" tennis shoes

ments in preference to that of a "similar" domestic article. Hoyt, Shepston & Sciaroni v. United States, 38 Cust.Ct. 741, A.R.D. 74 (1957), appeal dismissed, 45 CCPA 129 (1957); Geo. S. Bush & Co. v. United States, 48 Cust.Ct. 689, A.R.D. 140 (1962), appeal dismissed, 49 CCPA 139 (1962). However, as far as we are aware, no court has ever ruled that the American selling price of a "more similar" domestic article must be used in preference to that of a "less similar" domestic article; in fact, the *Hoyt, Shepston* opinion expressly leaves the question open. Appellant has neither argued the existence of such an implied standard nor attacked the validity of this provision as the grant of unregulated authority in the absence of such an implied standard. We, too, expressly leave this question open.

were freely offered for sale for domestic consumption to all purchasers in New York City, which the appraiser determined to be the principal market,[9] in the ordinary course of trade and in the usual wholesale quantities at the prices the appraiser used to appraise the imported tennis shoes.

### III. *If Not The "Rover," What?*

Since we have concluded that at least some of the "Rover" tennis shoes used as the basis for appraising the imported shoes were not "similar" to the imported shoes within the meaning of 19 U.S.C. § 1336, we must decide on what basis those importations which it is determined on remand were incorrectly appraised *should* be appraised.

In the very first reported opinion in this case, the original trial judge, the late Judge Mollison, set aside the submission of this case and restored it to the calendar for the purpose of receiving further evidence directed to proving that *no* domestically manufactured tennis shoe other than the United States Rubber Company's U. S. Keds "Rover" tennis shoes were both "similar" to the imported footwear and marketed in accordance with 19 U.S.C. § 1402(g). A. Zerkowitz & Co. v. United States, 48 Cust. Ct. 559, R.D. 10175 (1962). Zerkowitz and the Government have stipulated that the invoice price, f.o.b. port of lading, for the subject merchandise *was* its export value (19 U.S.C. § 1402(d)) and that there was no higher foreign value (19 U.S.C. § 1402(c)) for it; accordingly, the subject merchandise would be appraised at its export value if it were to

be found that there was *no* domestically manufactured tennis shoe which was "similar" to the imported shoe, the American selling price of which was capable of being determined in the manner specified by 19 U.S.C. § 1402(g).

 The Government has argued that, even if there was no substantial evidence to support the appraiser's determinations concerning "Rover" tennis shoes,

\* \* \* the appraised value, nevertheless, would not be affected. It it presumed that the Appraiser found a price which an American manufacturer would have received or was willing to receive for like or similar merchandise \* \* \*

citing Hudson Shipping Co. v. United States, 43 CCPA 19, 30, C.A.D. 604 (1955). We cannot agree. Neither that case nor the logic giving rise to the presumption supports the rule for which the Government contends. The presumption is, as we have often remarked, two-fold. It is presumed, first, that the appraiser's factual determinations were correct, and, second, that the appraisement itself is correct. However, one cannot derive from this that the appraiser is to be presumed to have done correctly what he clearly did not do at all.

The *Hudson* case merely sets forth the manner in which appraisers can arrive at prices which domestic manufacturers "would have received" or were "willing to receive," stating that, "from the evidence introduced, it seems clear that the appraiser *would* have had no difficulty in determining the price which the

---

9. We agree with the judge dissenting below that the appraiser's determination that New York City was the principal market for U. S. Keds "Rover" tennis shoes was shown to have been based on woefully outdated evidence. However, we disagree with him that "a presumption as to location of principal market cannot be indulged here since the appraising officers and the manufacturer of the counterpart shoe have given evidence of being without the knowledge and information on which such a presumption

could rest." Regardless of the correctness of the appraiser's determination, the orderly administration of customs law requires that it must stand unless and until the importer establishes an alternative. In this case, Zerkowitz offered no evidence tending to prove either that New York City was *not* the principal market for the domestic tennis shoes or that some other city was. Hence, the appraiser's determination stands, weak as its foundations are.

American producers \* \* \* 'would have received' or were 'willing to receive'." (Emphasis ours.) However, "Since appellant [the importer] \* \* \* offered no evidence tending to negative the possibility of a correct American selling price appraisal under the second part of section 402(g) [19 U.S.C. § 1402(g)], it follows that he has not overcome the presumption of correctness attaching to the appraiser's valuation, and has not made out a *prima facie* case." (Emphasis ours.)

The *Hudson* case, therefore, is authority for the proposition that where the appealed appraisement could have been based on any one of a number of different subsidiary facts, the appellant has the burden of establishing the nonexistence of all of those facts. This is so because, as the *Hudson* case points out, the presumption of correctness attaches, not only to the determination of the specific subsidiary fact or facts actually found by the appraiser, but also *to the appraiser's valuation,* and the party contesting the appraisement must offer evidence making out at least a prima facie case establishing the nonexistence of all the other possible subsidiary facts the existence of which would support the appraiser's determination. Of course, if the Government submits evidence tending to prove the existence of subsidiary facts supporting the appraiser's determination other than the subsidiary fact or facts actually found by the appraiser, the party contesting the appraisement has, not only the burden of *producing evidence* as to the nonexistence of these facts, but the burden of *persuading* the trial court of their nonexistence as well. See generally, McCormick, Evidence, §§ 306 & 307, pp. 635–639.

In this case, Zerkowitz did offer evidence tending to establish both that there were no "similar" domestic shoes other than the pre-1959 "Rover" and that, if any such shoes existed, no American selling price could be determined for them in the manner specified by 19 U.S.C. § 1402(g). However, both lower courts found that there *were* other do-mestically manufactured tennis shoes which were "similar" to the imported tennis shoes the American selling price of which could be determined in the manner specified by 19 U.S.C. § 1402(g). We cannot say that their determination was not supported by substantial evidence.

Accordingly, this case must be remanded for further proceedings to insure that the imported shoes are appraised on the basis of the American selling price of legally "similar" domestic shoes.

Remanded.