**NIKE, INC., Plaintiff,**

v.

**RUBBER MANUFACTURERS ASSOCIATION, INC., et al., Defendants.**

**No. 80 Civ. 4990.**

United States District Court, S. D. New York.

Feb. 27, 1981.

**914**

Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., Gregory R. Mowe, Portland, Or., of counsel; Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiff Nike, Inc.

Jay Greenfield, Jonathan Sinnreich, Elizabeth S. Koltun, New York City, of counsel; Alexander & Green, New York City, for defendant Rubber Manufacturers Assn., Inc.

Sullivan & Cromwell, New York City, for defendant Bata Shoe Company, Inc.; William M. Dallas, Jr., New York City, of counsel.

Cahill, Gordon & Reindel, New York City, for defendant Charles A. Eaton Co.; Dean Ringel, New York City, of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant Eltra Corp.; Shatzkin, Cooper & Rudoff, New York City, for defendant Hyde Athletic Industries, Inc.

Pennie & Edmonds, New York City, for defendant New Balance Athletic Shoe, Inc.

Arthur Dry & Kalish, New York City, for defendant Uniroyal, Inc.; Kirkwood, Kaplan, Russin & Vecchi, New York City, Kaplan, Russin & Vecchi, Washington, D. C., Julius Kaplan, Washington, D. C., Kathleen F. Patterson, of counsel.

Foley, Lardner, Hollabaugh & Jacobs, Washington, D. C., Douglas V. Rigler, Washington, D. C., of counsel for defendant and counterclaim plaintiff Brooks Shoe Manufacturing Co., Inc.

## OPINION

BONSAL, District Judge.

Nike, Inc. ("Nike"), an Oregon corporation, instituted this action in the United States District Court for the District of Oregon alleging violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Wilson Tariff Act, 15 U.S.C. § 8, and tortious conduct constituting unfair competition. On August 14, 1980, the United States District Court for the District of Oregon transferred the action to this district pursuant to 28 U.S.C. § 1404(a).

Nike is a manufacturer, importer, and distributor of athletic shoes. Approximately 20 percent of the shoes sold by Nike are manufactured at its four plants in New Hampshire and Maine; the remaining 80 percent are manufactured at foreign locations on a contract basis and are imported for sale in the United States.

The defendants are: Rubber Manufacturers Association, Inc. ("RMA"), a trade association of which plaintiff and the other defendants are members; Bata Shoe Company, Inc. ("Bata"); Charles A. Eaton Company ("Eaton"); Brooks Shoe Manufacturing Co., Inc. ("Brooks"); Eltra Corporation ("Eltra"); Hyde Athletic Industries, Inc. ("Hyde"); New Balance Athletic Shoe, Inc. ("New Balance"); and Uniroyal, Inc. ("Uniroyal"). All but Uniroyal, which terminated its marketing and distribution of footwear in August, 1979, are presently manufacturers of athletic shoes made and distributed in the United States.

The complaint charges that the defendants conspired to cause the United States Customs Service ("Customs") to impose excessive duties on shoes imported into the United States by Nike through its agent, Nissho-Iwai American Corporation ("Nissho") on behalf of Nike's wholly-owned subsidiary, BRS, Inc. ("BRS"), by causing Customs improperly to apply the American Selling Price ("ASP") appraisement method to Nike shoe imports. As overt acts, the complaint charges that certain of the defendants filed certifications with Customs covering shoes allegedly distributed by them in the United States which were false and which were used by Customs to determine the duty payable by Nike based on the ASP of shoes of like character to those which Nike was importing. Under the ASP

appraisement method, authorized by 19 U.S.C. § 1402(a)(4), the duty imposed by Customs is a percentage of the selling price of a freely-offered and sold domestic product that is "like or similar" to the imported product. Under ASP procedures, domestic manufacturers may submit to Customs copies of catalogs and price lists for shoes which they wish to be considered by Customs in making ASP determinations. These manufacturers must "certify" that the footwear described in the submitted material is freely-offered for sale for domestic consumption at the prices cited. Customs thereupon determines whether the imported shoes are "like or similar" to any certified shoe.

Plaintiff seeks injunctive relief and damages and a trial by jury.

Only the defendant Brooks has answered the complaint, denying the allegations and counterclaiming against Nike, which counterclaim is the subject of a separate proceeding. All the other defendants have moved, and Brooks has moved separately, for summary judgment pursuant to Rules 56(b) and 12(b)(6) of the Federal Rules of Civil Procedure, dismissing with prejudice Nike's claims with respect to duties assessed on Nike prior to October 2, 1979 by reason of a settlement Agreement dated August 21, 1980 between BRS, Nissho and their Sureties, and the United States Treasury and Customs, and dismissing without prejudice any claims with respect to duties assessed thereafter for Nike's failure to exhaust its administrative remedies. In a separate motion, defendants Eaton and New Balance move to dismiss the complaint as against them, pursuant to Rules 56(b) and 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim as against them.

Plaintiff has cross-moved, pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, for an order directing separate trials on the issues of liability and damages.

On May 23, 1980, Customs ascertained the amount of duties owed on Nike athletic footwear imported between November 10, 1977 and October 2, 1979. (This determination is known as liquidation of entries.) Nike did not protest Customs' determination under 19 U.S.C. § 1514. Instead, the Agreement dated August 21, 1980 was entered into between BRS, Nissho, Peerless Insurance Company and St. Paul Fire & Marine Insurance Company, the Sureties, on the one hand, and by the United States Department of the Treasury and Customs on the other. The Agreement recites that the United States has assessed additional duties pursuant to 19 U.S.C. § 1402(g) on Nike-brand footwear classified under Item 700.60 of the tariff schedules of the United States, 19 U.S.C. § 1202, and imported on entries filed between November 10, 1977 and October 2, 1979, by Nissho on behalf of BRS. The Agreement further recites that the United States has billed Nissho for such additional duties in the amount of $12,113,-206, payment of which has been guaranteed by the Sureties. The Agreement then recites that Nissho disputes its liability for such additional duties and that United States and Nissho have agreed to settle their dispute in accordance with the Agreement. Paragraph 1. of the Agreement provides that it is for settlement purposes only and is not an admission that Nissho is liable for additional duties, nor is it an admission by the United States that the assessment of the additional duties was erroneous. The settlement provides that Nissho shall pay to the United States the sum of $9,500,000 in settlement of the additional duties in not more than 24 monthly payments of not less than $395,833 each, beginning on October 1, 1980, with interest at 7%. In consideration of the settlement, Nissho, BRS and the Sureties waive any further procedural or administrative steps with respect to these duties and "waive all rights to seek administrative or judicial review or otherwise challenge or contest the validity of this agreement or the liquidations except in case of breach of this agreement by the United States."

Defendants contend that by causing its subsidiary, BRS, and its agent, Nissho, to enter into this Agreement, Nike waived any rights it had to contest the duties owed

on entries filed before October 2, 1979. Nike, on the other hand, contends that it signed the Agreement under duress, presumably because if it had not done so its footwear might have been excluded from the United States market. However, the record does not show any duress. *See, e. g., Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 893–94 (3d Cir. 1975). On the contrary, the Agreement reduced the amount of duties payable by over $2,500,000 and Nissho won the right to pay them in installments at an interest rate substantially below the general interest rates then prevailing.

▪ Nike concedes that it did not file any protest, pursuant to 19 U.S.C. § 1514(c)(1) and (2), with respect to the classification, appraisement or liquidation of ASP duties on any footwear imported by Nissho prior to October 2, 1979. In the absence of such protest, the decision of Customs to accept $9,500,000 in settlement of these duties is "final and conclusive upon all persons." * Accordingly, Nike, having chosen to pay this reduced amount, may not now challenge the propriety of Customs' final liquidation. See *Port of Boston Marine Terminal Association v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71–72, 91 S.Ct. 203, 209–210, 27 L.Ed.2d 203 (1970).

▪ The Agreement prohibits reopening the matter of duties levied on goods imported prior to October 2, 1979. It follows that Nike would be unable to prove in this action that the defendants influenced Customs through false certifications to impose higher duties on goods imported prior to October 2, 1979 with a view to restricting Nike's ability to compete in the American market. Moreover, the figures furnished to the Court indicate that Nike's share of the American market in athletic shoes has increased dramatically in recent years. The Court finds that by entering into the Au-

gust 21, 1980 Agreement, the plaintiff voluntarily waived any antitrust claims which it may have had against the defendants for influencing the duties levied on goods imported prior to October 2, 1979.

For the foregoing reasons, the motion of the defendants for summary judgment with respect to plaintiff's claims arising prior to October 2, 1979 is granted.

There remains the matter of duties arising subsequent to October 2, 1979. Defendants contend that plaintiff has not exhausted its remedies in Customs and that until it does so, this Court is without jurisdiction. On the other hand, Nike contends that this Court has jurisdiction to take evidence to establish the claimed violations of the antitrust laws.

Congress, by Act of May 28, 1926, established the United States Customs Court. The Customs Court was given broad powers to administer the tariff laws of the United States, to hear and determine applications for the review and reappraisal of merchandise being imported, protests against decisions of collectors, petitions for remission of additional duties, and all other matters involving the levying of duties on imported merchandise.

On October 10, 1980, Congress enacted the Customs Court Act of 1980 ("the Act"), Public Law 96–417, which became effective on November 1, 1980. The Act broadened the jurisdiction of the Customs Court, renamed it the United States Court of International Trade, and designated it an "Article III" court. The report of the Senate Judiciary Committee states that it was Congress' intent that the United States Court of International Trade and the Court of Customs and Patent Appeals be utilized exclusively in resolutions of conflicts and disputes arising out of the tariff and international trade laws, thereby eliminating the

---

* 19 U.S.C. § 1514(a) provides in part:

"[D]ecisions of the appropriate customs officer, including the legality of all orders and findings entering into the same, as to—
 (1) the appraised value of merchandise;
 (2) the classification and rate and amount of duties chargeable;

 . . . .
 (5) the liquidation or reliquidation of an entry, or any modification thereof;
shall be final and conclusive upon all persons (including the United States and any officer thereof) unless a protest is filed in accordance with this section . . . ."

jurisdictional conflicts between these courts and the federal district and appellate courts. S.Rep.No.96–466, 96th Congress, 1st Sess.

Section 505 of the Act provides:

"(c) The district courts shall not have jurisdiction under this section [28 U.S.C. § 1337] of any matter within the exclusive jurisdiction of the Court of International Trade under Chapter 95 of this title."

Section 201 of the Act sets forth those matters within the exclusive jurisdiction of the Court of International Trade and adds a new jurisdictional provision which provides in part that the Court of International Trade is given "exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under Section 515 of the Tariff Act of 1930." 28 U.S.C. § 1581(a).

 Customs and the Court of International Trade are uniquely qualified to resolve the legal and factual issues which Nike's claims have raised: whether the certifications were false under 19 C.F.R. § 152.24(c); whether the certifications, if false, were relied upon by Customs in making particular ASP determinations; and whether other shoes or certifications available to Customs would support the assessment of ASP duties. Under the doctrine of primary jurisdiction, it is appropriate that Customs first resolve these issues and that after completion of this administrative procedure, the Court of International Trade have the opportunity to review the procedure. The legislative history of the Customs Court Act reveals a clear congressional intent that all matters relating to the appraisement and liquidation of duties be resolved in a single forum.

In *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed. 525 (1973), the Supreme Court recognized that administrative proceedings often obviate the need for relitigation of an issue in district court. Ricci had filed an antitrust complaint charging the Chicago Mercantile Exchange and others with conspiring to restrain his business by transferring his ex-change membership to another individual. The Supreme Court held that the antitrust proceeding should be stayed until the Commodity Exchange Commission had determined the validity of the Exchange's conduct under the Commodity Exchange Act, since this determination was within the special competence of the Commission. *See also Far East Conference v. United States*, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 560 (1952); *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–65, 1 L.Ed.2d 126 (1956); *Levitch v. C.B.S.*, 495 F.Supp. 649 (S.D.N.Y.1980).

In *Mt. Hood Stages, Inc. v. Greyhound Corp.*, 616 F.2d 394, 397–98 (9th Cir. 1980), the court applied the principle of primary jurisdiction in circumstances similar to those here presented. There, the plaintiff contended that the Interstate Commerce Commission had approved certain acquisitions in reliance upon defendant's false representations that it would not engage in certain practices. The court noted that this issue, which was critical to the question of antitrust immunity, involved matters which Congress had given the Commission jurisdiction to regulate and was therefore within the primary jurisdiction of the Commission. *See also J. C. Penney Co. v. United States Treasury Dept.*, 439 F.2d 63 (2d Cir.) *cert. denied*, 404 U.S. 869, 92 S.Ct. 60, 30 L.Ed.2d 113 (1971); *Flintkote Co. v. Blumenthal*, 596 F.2d 51 (2d Cir. 1979); *Jerlian Watch Co. v. United States Dept. of Commerce*, 597 F.2d 687 (9th Cir. 1979).

A recent decision of this court, *Alberta Gas Chemicals, Ltd. v. Celanese Corp.*, 497 F.Supp. 637 (S.D.N.Y.1980) (Sofaer, J.), also concerns submission before an agency of allegedly false information. In that case, Alberta, a Canadian producer of methanol, sued Celanese, a domestic producer, for alleged fraud and unfair competition. Alberta claimed that Celanese had presented false and misleading testimony at a hearing before the International Trade Commission, in consequence of which the Commission concluded that Canadian imports of methanol were likely to injure the domestic industry in the future and therefore should be

subject to special dumping duties. The court concluded that Alberta could not sue Celanese for damages because it had not established that the alleged perjury was part of a larger fraudulent scheme. The court further noted that the Customs Court had exclusive jurisdiction over actions challenging orders or findings made in the administrative process and that, after resort to this procedure, "[t]he claim for damages might be mooted if the Commission's determination were changed, since plaintiff's damages apparently all result from the Commission's decision."

 It would appear that if Nike believes that liquidated duties on goods imported subsequent to October 2, 1979, or any part of them, were caused by false certifications by one or more of the defendants pursuant to an antitrust conspiracy, its first recourse would be to protest these duties and seek relief before Customs. In the event no relief is obtained, its next recourse would be to the United States Court of International Trade, with an appeal to the United States Court of Customs and Patent Appeals. If these proceedings establish unlawful action on the part of the defendants or any of them, the evidence would be admissible in this Court in an antitrust suit.

By a prospectus dated December 2, 1980, Nike offered 2,377,000 shares of its Class B common stock to the public. Under the heading "Import Duties and Quotas," the prospectus discusses Nike's liability to pay customs duties, including those assessed under the American Selling Price method. The prospectus states:

> "The Company has settled a disputed liability relating to duties under the ASP method for imports prior to October 2, 1979, and, since that date, has been paying duties on the ASP method and does not anticipate any material liabilities for unrecorded retroactive additional duties. As a result of GATT negotiations, the ASP appraisement method will be replaced in July, 1981, by a new fixed duty structure under which rates of duty will range from approximately 20% to 48% of the cost of imported fabric footwear.

> The Company believes the new rate structure will provide greater cost certainty and will not have a material financial impact."

After the ASP method is replaced by a new fixed duty structure in July, 1981, it is hard to see how any conspiracy by the defendants will be able to influence the duties paid on Nike imported shoes. Therefore, only duties between October 2, 1979 and June 30, 1981 based on the ASP method will be open to the possibility of a conspiracy to make false certifications by the defendants.

Since only a short period of time is involved, defendants' motion for summary judgment with respect to violations of the antitrust laws arising by reason of duties levied subsequent to October 2, 1979 is denied, and the action will be stayed until June 30, 1981 to permit Nike, through BRS and Nissho, to pursue its remedies in the Customs and United States Court of International Trade. It may be that Nike, through BRS and Nissho, will develop evidence of conduct by defendants not protected by the *Noerr-Pennington Doctrine, see Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), establishing violations of the antitrust laws. Such evidence would be admissible in this action. If no proceedings have been commenced by June 30, 1981, defendants may move to dismiss this action with prejudice. On the other hand, Nike may move for a further extension of the stay for good cause shown.

Settle order on notice.