**STRIDE RITE CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 81–5–00631.**

United States Court of
International Trade.

Jan. 9, 1985.

Doherty, Melahn & Middleton, William E. Melahn, Boston, Mass., for plaintiff.

Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office and Jerry P. Wiskin, U.S. Dept. of Justice, Civil Div., Washington, D.C., for defendant.

RESTANI, Judge:

Plaintiff, an importer of children's and youths' footwear brought this action to contest the Customs Service's ("Customs") valuation of duties on its merchandise according to American Selling Price ("ASP"). ASP is a method of valuation formerly found at 19 U.S.C. § 1402(a)(4) (1976) which was repealed in 1979.[1] Plaintiff's goods were exported between December 16, 1977

---

1. The former 19 U.S.C. § 1402(g) defined ASP by providing that:

The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale for domestic consumption to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such article when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article.

and March 9, 1978 and entered at the port of Boston, Massachusetts.[2] Using the Junior Jogger made by the Bata Shoe Company, an American manufacturer, as the prototype, Customs appraised plaintiff's children's and infants' footwear at $5.30 per pair, less 2% packed and appraised the youths' and boys' products at $5.85 per pair, less 2% packed. Contesting the use of the Bata prototype, plaintiff argues that there was no ASP in this case and therefore the correct basis of appraisement was Export Value, 19 U.S.C. § 1402(d) (1976) (repealed 1979) or alternatively United States Value, 19 U.S.C. § 1402(e) (1976) (repealed 1979).[3] Only if the ASP valuation was improper, must the court consider plaintiff's proposed valuations. 19 U.S.C. § 1402(a) (1976) (repealed 1979).

The ASP "method of valuation ignore[d] the price of the imported article and turned instead to the price at which such articles of American manufacture were freely offered for sale for domestic consumption." *Converse Rubber Co. v. United States*, 64 Cust.Ct. 779, 782, 314 F.Supp. 1241, 1243 (1970), *aff'd*, 66 Cust.Ct. 652, 328 F.Supp. 493 (1971). ASP appraisement was designed to protect domestic manufacturers of limited classifications of goods, including certain coal tar products and certain goods, "by virtue of a Presidential proclamation issued under section 336 of the Tariff Act of 1930 (19 U.S.C. § 1336)" R. Sturm, *Customs Law & Administration* § 44.1 (2d ed. 1982), *citing Bestway Products, Inc. v. United States*, 58 Cust.Ct. 613 (1967). Among the classifications of goods to which ASP appraisement applied was certain footwear "wholly or in chief value of India rubber or substitutes for rubber." T.D. 54,521; *see also E. Dillingham, Inc. v. United States*, 67 Cust.Ct. 457, 328 F.Supp. 1392 (1971). At the operative time in this case, ASP valuation was applied to footwear with a rubber portion over fifty percent by weight and classifiable under the Tariff Schedules of the United States

("TSUS") 700.60 according to headnote 3(b), Part 1A, Schedule 7 of the TSUS. It is, of course, that classification which is relevant in the instant case. Pursuant to § 336, like or similar merchandise was the focal point of ASP law and the standard for selection by Customs of a prototype American article.

It is upon the "like or similar" requirement that plaintiff bases its first attack on the appraisement. Plaintiff's merchandise, the Stride-Rite Flyer is a rubber soled shoe with a canvas upper. Customs's prototype, the Bata Junior Jogger, is also a rubber soled shoe but has a nylon upper. The shoes are both of vulcanized rubber construction, the soles of both shoes are calendared with a series of "zig-zag" striations and indentations, and both shoes appear to be modeled on the athletic shoes currently worn by adults for running and jogging.

The terms "like" and "similar" have been subject to judicial interpretation. The two terms present separate standards. The term "like" means the same or identical. *Albert F. Maurer Co. v. United States*, 51 CCPA 114, 117 (1964). The difference between the nylon and canvas uppers, as well as ornamental design detail, prevents the subject products and the prototype from being "like" products. Hence, the question is only whether the two products are similar. *Id.*

Courts have delineated a four part test for "similarity" in which the factors to be considered are:

(1) similarity of material

(2) commercial interchangeability

(3) adaptability to the same use

(4) competitive character

*A. Zerkowitz & Co. v. United States*, 58 CCPA 60, 65, 435 F.2d 576, 580 *reh'g. denied*, 58 CCPA 72, 438 F.2d 1240 (1970), *cert. denied*, 404 U.S. 831, 92 S.Ct. 72, 30 L.Ed.2d 60 (1971), *dismissed on remand*, 69 Cust.Ct. 228 (1972); *United States v.*

---

**2.** Since the subject products were exported before repeal of the ASP statute, ASP is potentially applicable.

**3.** In its post-trial brief, plaintiff dropped its claim for an alternative ASP based on a different prototype.

*Japan Import Co.,* 2 Cust.Ct. 926, 932 (1939). In the *Zerkowitz* case, the Court of Customs and Patent Appeals stressed the commercial interchangeability factor when it explained:

> ... [S]imilarity under 19 USC 1336 is, as our predecessor court wrote in *United States v. Wecker & Co.,* 16 Ct.Cust. Appls. 220, 225, T.D. 42837 (1928),
>
> > ... to be measured by much the same homely rule that applies to the prospective customer who enters a store seeking some utilitarian article of a certain specific name and style; he finds the article requested is not in stock but that another article, of approximately the same price and which will perform the same functions, is capable of the same use and may be substituted therefor, is available. Such an article is a similar article, notwithstanding the price, the methods of construction, and the component materials may be somewhat different; but, for all utilitarian purposes, one is a substitute for the other.
>
> And, we would now add, it is approximately what the customer wanted and acceptable to him as a substitute.

58 CCPA at 67–68.

At trial plaintiff sought to differentiate between its canvas shoe and the nylon prototype on two grounds in order to demonstrate that the shoes did not meet the four part test. First, plaintiff's witness Dr. Park stated that the differences between the material in the uppers of the shoes made the prototype far more durable but allowed only plaintiff's Flyer to be merchandised as washable. Stride-Rite vice-president for merchandising, Mark Cocozza, testified that the Flyer was specifically made of canvas so that it could be washed. Plaintiff thus argued that washability prevented commercial interchangeability.

■ Defendant's witnesses, on the other hand, presented the view that washability was not a major difference and would not prevent the shoes from being commercially interchangeable. Furthermore, the court gives little weight to Dr. Park's testimony on the issue of commercial interchangeability because he was shown to have no experience in marketing shoes. The burden was on plaintiff to prove a differentiation in the mind of the ultimate purchaser of the shoes by a preponderance of evidence, and that burden was not met here. *Cf. Park Avenue Imports Co. v. United States,* 62 Cust.Ct. 1035, 1043, 299 F.Supp. 528, 534 (1969).

■ Second, plaintiff argued that the shoes were not designed for the same use because the prototype is a "dress" shoe while the subject product is a play shoe. The testimony of plaintiff's own witnesses is inconsistent on this issue. And defendant's witnesses testified to the contrary. Furthermore, the physical evidence of the merchandise itself indicates the article in issue is a children's play shoe. Thus, plaintiff has failed to meet its burden. Accordingly, the court finds that the subject product, the Flyer, and Customs prototype, the Junior Jogger, are "similar" for purposes of the ASP law.

A finding of similarity alone is not enough, however, to sustain an ASP appraisement. For not only must the prototype be similar to the subject product, but it must be freely offered for sale in the principal market of the United States. 19 U.S.C. § 1402(g). Plaintiff makes several challenges to Customs' finding that the Bata Junior Jogger was freely offered for sale.

■ In the first instance, plaintiff argues that Customs relied upon incomplete, inaccurate, and vague information in reaching its determination concerning the Bata shoe. Plaintiff argues that Customs' decision was based on answers to a questionnaire (Pl. Exhibit 5) filed by Bata executive Lee Kursewicz which was not well researched and which did not contain specific answers.[4] Although there was testimony

---

**4.** "Under ASP procedures, domestic manufacturers [could] submit to Customs copies of catalogs

and price lists for shoes which they wish[ed] to be considered by Customs in making ASP deter-

demonstrating that Mr. Kursewicz did not examine company records when filling out the questionnaire, the testimony at trial showed the questionnaire to be essentially accurate.[5] Thus, the presumption of correctness given to the appraiser's decision was not overcome. *See Hudson Shipping Co. v. United States*, 43 CCPA 19, 28 (1955).

■ As its next argument on the freely offered for sale issue plaintiff urges that Bata did not follow its own price list because it provided discounts and different payment schemes to certain purchasers. Plaintiff's witness Mr. Weedon testified that he examined Bata's files and found several variances from the price list submitted to Customs. Discounts alone, however, do not mandate a finding that a product was not freely offered. *See Aceto Chemical Co. v. United States*, 51 CCPA 122, 125 (1964).

■ The *Aceto* court held that when a chemical company sold some of its product below list price and some at list price but offered its product to all purchasers at list and allowed any purchaser to buy the product at the list price, the list price would be used as a "freely sold" price.[6] *Id.* Here the evidence at trial demonstrated that there were substantial sales at list price terms and discounts or different payment terms were given for legitimate business reasons or were the result of inadvertence. Thus, despite the presence of a few instances of deviations from price list terms in the instant case, the prototype may be said to have been freely offered for sale at the list price as long as the prototype was available to anyone desiring to purchase it at that price.

■ Plaintiff next argues that Bata divided its operation into two divisions, an "in stock" department and a "make-up" department, but restricted the sale of "essentially the same shoe" by the make-up department. Bata's former president Mr. Stiegle explained that the "branded" or "in-stock" division sold products with Bata's own trademark affixed while the make-up division manufactured shoes with specific customers' trademarks. Testimony indicated that the shoe manufactured by the make-up division sold for twenty-five percent less than the in-stock shoe. Also, there appears to be no disagreement that the make-up shoes were not freely offered for sale but that instead, prices were individually negotiated. This evidence, however, does not defeat Customs' ASP appraisal. The appraisal was based purely on the shoe marketed under Bata's own name from its in-stock division. The specific Bata product used as a prototype was not shown to be anything but freely offered to any purchaser. The specially made products, even if quite similar to the Bata brand name goods, were not utilized by Customs as a prototype. Plaintiff's argument concerning the two divisions is thus irrelevant.[7]

■ Assuming *arguendo* that the make-up shoe and the prototype were not different shoes, ASP valuation based on the prototype is still appropriate. The make-up

---

minations. These manufacturers [were required to] 'certify' that the footwear described in the submitted material [was] freely-offered for sale for domestic consumption at the prices cited." *Nike, Inc. v. Rubber Manufacturers Assoc.*, 509 F.Supp. 912, 915 (S.D.N.Y.1981) (dismissing some antitrust claims and staying consideration of others pending outcome of related case in CIT).

5. Mr. Kursewicz relied on his knowledge of the company based on substantial experience.

6. Under 19 U.S.C. § 1401a(e) the *Aceto* court was required to look at a "freely sold" standard. The *Aceto* court relied on language in *United States v. Mexican Products Co.*, 28 CCPA 80 (1940) cited by plaintiff. In the *Mexican Products* case which dealt with a statute which used the term "freely offered" rather than "freely sold", the court found that despite a majority of sales at other than list price, only list price constituted the price at which goods were freely offered to all purchasers in the usual wholesale quantities and in the ordinary course of trade. 28 CCPA at 90.

7. A make-up division shoe was not introduced at trial but testimony indicated there were some material and cosmetic differences between the make-up shoe and the in-stock shoe.

division sold shoes in large quantities. Where there are substantial sales at list price, discounts from list price based on large volume purchases will not prevent the utilization of list price as ASP. *See G. Gennert (Inc.) v. United States*, 18 CCPA 12, 15 (1930) (decided under Tariff Act of 1922). *See also Aceto Chemical Co. v. United States*, 51 CCPA at 125; *United States v. Mexican Products Co.*, 28 CCPA at 90. Thus, the only question remaining which relates to the "freely offered" issue is whether a class of potential purchasers was excluded by Bata from buying the prototype.

■■■ When a seller refuses to sell at list price to a certain customer or class of customers, the product is not freely offered. *See Hudson Shipping Co. v. United States*, 43 CCPA at 20, 26 (1955) (monopoly pricing or discrimination would prevent product from being freely offered); *and Jno. G. McGiffin v. United States*, 38 Cust.Ct. 609 (1957) (price list restricted to jobbers was evidence that plaintiff's proposed prototype was not freely offered). It is on the basis of restricted sales that plaintiff grounds its last challenge. Plaintiff contends that Bata would not sell its product to either discount stores or mail order houses. In support of its argument plain-

tiff cites the testimony of Mr. Earls, sales manager of Bata's eastern region in-stock division, who was sales manager in the make-up division from 1977 to 1978. This testimony [8] creates the impression that Bata would not have sold to discounters, in order to maintain the reputation of its product. On the other hand, there is clear testimony that no offers to buy at the list price were rejected, except for credit reasons. There is also testimony that Bata would have sold the prototype to a large discounter. Overall the testimony at trial, however, indicates that discounters simply did not seek to buy the prototype shoe at list price, and there was no evidence that the lack of attempts to purchase by discounters was the result of actions or statements by Bata employees. Where a group of potential buyers has eliminated itself from the available market, it is irrelevant whether or not the prototype seller hypothetically might be reluctant to sell to such customers.

■■■ Plaintiff also cites the Bata questionnaire to support the proposition that Bata refused to sell to mail order houses. Bata's response simply indicates that no sales were made. It does not state that any sales were requested and refused. In sum, plaintiff has failed to prove, by a

---

**8.** The relevant testimony which appears at Volume III of the Transcript at 63–64 reads as follows:

Q During the period 1977, 1978, did you sell to any discounters?
A Yes.
Q Big discounters, like Meldisco, in the in-stock division?
A No.
Q Do you recall that you and I met before you took your deposition testimony?
A Yes.
Q And, I think it was the day after that very bad airplane crash in Washington a few years ago?
A Possibly.
Q And was Mr. Weidan [*sic*] present at that time?
A Yes.
Q And I told you who I was representing and I was with Mr. Weidan and I asked you some questions regarding this matter?
A Yes.
Q And do you recall I asked you whether or not you have any policy with respect to selling

to the big discounters like Meldisco, from the in-stock division?
A To some extent, yes.
Q Do you recall telling me, in the presence of Mr. Weidan, that in fact, no company, such as Bata, would be willing to sell to discounters, because it could do very serious damage to it, by diluting your brand name. Do you recall making that statement in my presence?
A Yes, Mr. Melahn. However, these specific questions you are talking about was part of a 10—maybe 15 minute conversation concerning that one topic. Therefore, many statements could have been made.
Q Do you recall my making that statement and your giving me that answer? Do you recall telling me that during that conversation—that you, Bata, would not sell to a discounter such as Meldisco, from your in-stock division, because it would seriously dilute your brand name?
A I don't recall making that statement, but it's very possible I could have made that statement.

preponderance of the evidence, that the prototype was not available at the list price to whomever wished to purchase it.

Since the court has found that the prototype Junior Jogger was similar to the subject Flyer and that the prototype was freely offered for sale at list price, plaintiff's alternative methods of valuation need not be examined. Accordingly, the appraisal is found to be correct, and judgment is rendered for defendant.