SAMUEL BRILLIANT CO., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 83–09–01351

(Decided April 1, 1987)

*Doherty and Melahn (William E. Melahn)* for plaintiff.
*Richard K. Willard,* Assistant Attorney General, *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office *(Florence M. Peterson)* for defendant.

DICARLO, *Judge:* Plaintiff challenges the appraisement and liqui- dation by the United States Customs Service (Customs) of imported footwear invoiced as Style No. 218PB at $26.84 per pair. The Court has jurisdiction under 28 U.S.C. § 1581(a) (1982). The Court holds that plaintiff has failed to overcome the presumption of correctness that attaches to a Customs determination and affirms the appraise- ment and liquidation.

## DISCUSSION

Plaintiff contends that Customs appraisement, based on Ameri- can Selling Price (ASP), section 402(g), Tariff Act of 1930, as amended, 19 U.S.C. § 1402(g) (1976) (repealed 1979), is improper since the domestic prototype used by Customs, Servus Rubber Com- pany's (Servus) boot Style No. 25802, is not similar to the imported merchandise for the purposes of ASP appraisement. Plaintiff claims the imports should have been appraised and liquidated on the basis of export value, Section 402(d), Tariff Act of 1930, as amended, 19 U.S.C. § 1402(d) (1976) (repealed 1979), at $3.80 per pair.

ASP appraisement is discussed in detail in several prior opinions of the Court. *See, e.g., Samuel Brilliant Co.* v. *United States,* 9 CIT 180, Slip Op. 85–41 (April 4, 1985); *Academy Broadway Corp.* v.

*United States,* 9 CIT 55, Slip Op. 85–16 (Feb. 5, 1985); *Stride Rite Corp.* v. *United States,* 9 CIT 10, 605 F. Supp. 279 (1985), *aff'd* 85–2067 (Fed. Cir. Oct. 25, 1985). Essentially, ASP appraisement requires that the valuation of certain items be based upon the price of "like or similar" domestically produced goods, rather than the price of the imported item. The purpose of this valuation scheme was to protect domestic manufacturers of designated products from foreign competition by equalizing cost of production through the application of a duty rate to an adjusted, increased value for the like or similar imported product.

The question presented is whether the imported merchandise is similar to the domestic prototype selected by Customs. In answering this question, the Court is guided by the four-part test for similarity that has evolved from prior cases in which the factors to be considered are: (1) similarity of material; (2) adaptability to same use; (3) competitive character; and (4) commercial interchangeability. *See, e.g., Stride Rite,* 605 F. Supp. at 282–83; *A. Zerkowitz & Co.* v. *United States,* 58 CCPA 60, 65, 435 F.2d 576, 580 *reh'g denied,* 58 CCPA 72, 438 F.2d 1240 (1970), *cert. denied,* 404 U.S. 831 (1971), *dismissed on remand,* 69 Cust. Ct. 228 (1972).

(1) Similarity of the Material

Both the imported merchandise and the domestic prototype are boots made almost entirely of rubber. The domestic prototype has a hosiery lining and contains a steel shank. The imported boot also contains a steel shank but has a fleece or pile lining.

Relying on the testimony of its witness, the president of a footwear import company, plaintiff argues that the domestic boot is made of a superior rubber material that is thinner, lighter, more supple and more flexible. Plaintiff also suggests that the difference in lining precludes a finding of similarity of material.

Based upon the exhibits and testimony, the Court finds that the rubber is of the same or similar quality, that consumers would not be able to differentiate between the quality of rubber even if any existed and that the difference in lining accounts for much of the distinction in flexibility. The Court further finds that the differences in lining are not important. It has long been accepted that goods may be legally similar for appraisement even though numerous differences exist. *See, e.g., Albert F. Maurer Co.* v. *United States,* 51 CCPA 114, 120, C.A.D. 845 (1964).

(2) Adaptability to Same Use

Plaintiff contends that its imported merchandise is suitable for use by young boys in snow and ice. Plaintiff emphasizes that its boot has an expandable gusset which along with seven eyelets allows lacing that secures the cloth of the boy's pants to his leg for optimum cold weather protection against snow and ice.

In contrast, plaintiff asserts that the domestic prototype is a tubular slip-on with only three eyelets at the top, making it less capable of securing the cloth of the boy's pants and less receptive in terms of space for thick winter clothing. Plaintiff contends that these differences in design demonstrate that the domestic boot is more suitable as a mud boot for warm, wet weather. Plaintiff also points to the initial trial exhibit of a narrow sized Servus boot offered by defendant and argues that such narrow width is more suitable for females rather than young boys.

The Court finds the minor differences between the two boots in style and appearance, such as seven versus three eyelets and expandable gusset versus slip-on, do not significantly affect or alter the functional design of the boots. As noted above, the boots can be legally similar despite differences. *Id.*

Even if the import is better suited for cold weather protection, such evidence only reaffirms its adaptability to the same use as the domestic prototype, which the Court finds is designed for use by young boys in snow and ice. Joint Exhibit 4, a Servus catalogue, describes the domestic boot as a "Northerner," and "insulated pac" that "provides warmth and comfort in the coldest weather."

In any event, the Court finds that both boots are adaptable to use in warm, wet weather for protection from water and mud, should such use be required or desired. Also, the Court finds that the domestic boot is designed for use by young boys in both narrow or a regular width.

(3) Competitive Character

Two important aspects of competitiveness for comparison are price and place where marketed or sold. With respect to pricing, the parties stipulated that the export price of the imported boot is $3.80 per pair. Testimony reveals that it is sold to retailers by the plaintiff for $10.50 per pair. The domestic prototype costs $18.00 per pair to manufacture, and its catalogue lists price to retailers is $28.64 per pair.

Plaintiff argues that these price differentials cause a great disparity in ultimate purchase price to the consumer, resulting in a lack of competitiveness since the consumers of its product make their choice in favor of low price. Defendant argues, on the other hand, that the primary reason for the disparity in ultimate price is the difference in production costs. Defendant contends that the materials and labor are much cheaper in the country where the import is made, especially since such boots require intensive labor involving up to twenty people to handwrap the layers of rubber.

Although plaintiff may be right in its assertion that the consumer makes a purchase decision based on price, the Court finds any lack of competitiveness that results from such choice under the present circumstances arises primarily because of the wide disparity in production costs. As noted at the outset, the purpose of the ASP statute

was to equalize such disparity in production costs. In light of the purpose of the ASP statute, a difference in price in this case does not preclude a finding of similarity in competitiveness.

With respect to the places where the merchandise is marketed or sold, plaintiff contends that it targets low to medium income customers and sells its boots in low priced shoe stores, flea markets, and low priced wholesale and discount stores. Plaintiff asserts that all stores in which it markets the import are in the snow belt of the United States. Plaintiff argues that the domestic prototype is sold in the farm belt of the United States in farm stores, industrial footwear and better grade sporting goods stores, and in the "upstairs" of department stores.

The Court has found that the two boots are designed to be used by young boys for protection against cold, snow, ice, water and mud. The Court is not persuaded by the testimony presented that the domestic boot is sold in a distinct geographic region referred to as the farm belt while the import is sold only in a region known as the snow belt. Both boots are sold to young boys or their parents in areas in the United States where such protection from the elements is needed.

Also, defendant's witness, the president of the shoe company marketing the domestic prototype, testified that it targets the sale of its boots to middle and lower income families. The Court is persuaded by the testimony of defendant's witness and finds that the two boots compete in the same market. The Court reasons that the exact type of store in which the two boots are sold is not relevant, since the parents of young boys have access to a variety of stores and could make their purchase at any type of store. The evidence on the record does not demonstrate that medium to low income parents purchase their children's shoes only from discount stores rather than from what is referred to as the "better" stores nor does the evidence negate the likelihood that affluent parents purchase shoes for their children at bargain stores. The Court is not persuaded that a class system exists in the purchasing of rubber boots for children.

(4) Commercial Interchangeability

In its evaluation of the first three factors, the Court has found that both boots were designed to be worn by young boys for cold or wet weather protection. The plaintiff's and the defendant's witness testified that young boys only wear such boots for approximately one season, due to their rapid growth, and that parents will only purchase one pair of boots of this type for their children. The Court is persuaded that either boot would fulfill the needs of the young boys for protection from cold or wet weather and the needs of their parents to provide such protection. In these respects, the Court finds the two boots to be commercially interchangeable.

## Conclusion

After having considered the relevant facts in light of the controlling factors for determining similarity, the Court concludes that the imported merchandise is similar to the domestic prototype for purposes of ASP appraisement. Plaintiff has failed to overcome the presumption of correctness that attaches to Customs determination. The Court affirms the appraisement and liquidation of the imported footwear by Customs and enters judgment accordingly.